NOT DESIGNATED FOR PUBLICATION

No. 120,566

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JUSTIN BURKE ECKERT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Miami District Court; AMY R. HARTH, judge. Opinion filed March 4, 2022. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Jason A. Vigil*, assistant county attorney, *Elizabeth Sweeney-Reeder*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., MALONE, J., and RICHARD B. WALKER, S.J.

PER CURIAM:  A jury convicted Justin Burke Eckert of aggravated kidnapping, aggravated battery, aggravated assault with a deadly weapon, criminal threat, cultivation of marijuana, and 25 counts of possession of drug paraphernalia. In this, his direct appeal, he argues that (1) there was insufficient evidence to support his aggravated kidnapping conviction; (2) his 25 convictions for possession of drug paraphernalia are multiplicitous; (3) there was insufficient evidence to support two of his possession of drug paraphernalia convictions; (4) the district court erred in failing to give a voluntary intoxication instruction; (5) cumulative error denied him a fair trial; (6) his criminal restitution

1

judgment is unconstitutional under section 5 of the Kansas Constitution Bill of Rights and the Sixth Amendment to the United States Constitution; and (7) the district court's imposition of a no contact order together with his prison sentence constitutes an illegal sentence. We agree with Eckert that his possession of drug paraphernalia convictions are multiplicitous and that the no contact order is an illegal sentence, but we otherwise affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We must set forth the facts in detail because Eckert is challenging the sufficiency of the evidence to support his convictions. Linda Eckert married Eckert in 2010 but the two had been living separately since about 2014. Linda left Eckert because he had a drinking problem. During their separation, Eckert began to date Amber Dial. Dial and Eckert had an on-again-off-again relationship.

Dial and Eckert often argued, and Dial would either leave Eckert's house or he would kick her out. Their arguments were not violent. But that changed on December 10, 2016. Dial and Eckert were living together at his house. That afternoon, the two went to Dial's father's house to help him pack. At the house, Dial packed while her father and Eckert drank whiskey and coke and visited. Eckert drank with Dial's father for six or seven hours. Eckert and Dial also smoked some marijuana. Later, Dial drove the pair back to Eckert's house. When they got to the house, Dial checked her car for a joint of marijuana that Eckert dropped during the drive. After she could not find the joint, Dial went into the living room and began to grind up more marijuana.

At the time, Eckert was sitting in the dining room "mumbling to himself" and seemed aggravated. Dial put down the marijuana and decided to go pack her things because Eckert was getting more aggravated. When she was packing her clothes in the bedroom, Eckert came in and broke the hangers she had her clothes on. Eckert then

2

pushed Dial to the floor and began kicking her side. Dial got up and tried to get to the living room to escape the house, but Eckert pulled her back by her hair. Dial eventually broke free and fell into the living room. Eckert then straddled her and began to punch her in the face. Eckert took Dial's cell phone and threw it against the wall.

Eckert then dragged Dial back into the bedroom by her feet. Eckert went to throw up and Dial sat herself up in the doorway between the bedroom and living room. Eckert hit Dial three or four times with a piece of wood, which they used to prop the window open. Eckert then took a picture of Dial. Dial tried to crawl away while Eckert called Linda on the phone. Eckert told Dial that she needed to put her boots on so she could "go bury [her] own grave." When Linda answered the phone, Eckert told her that if she loved him, she would come help "bury [Dial's] grave." Dial believed Eckert planned to kill her.

At some point after Eckert got off the phone, Eckert's mother knocked on the door and called for Eckert. Eckert told Dial to be quiet or he would shoot her and his mother. Dial knew Eckert had a gun that he kept in the safe in the bedroom. And Dial had seen Eckert access what was in the safe before. So Dial stood quietly with Eckert while his mother continued to knock. Dial also remembered Eckert holding a knife against her and telling her to be quiet but she could not recall when in the sequence of events this occurred. After Eckert's mother left, Eckert told Dial to go lay down before he "black[ed] [her] other eye." Dial and Eckert laid down on the bed. After Eckert fell asleep, Dial left the house and drove herself to the sheriff's department.

Meanwhile, after receiving the picture and phone call from Eckert, Linda called the Miami County Sherriff's Office and was patched through to Deputy Michael Graves. Linda told Graves that her husband, Eckert, had beaten up his girlfriend and that he called her and said he was going to "'bury this bitch.'" Linda told Graves she had proof and forwarded him the text messages she had received from Eckert.

*Law enforcement investigation and charges*

After talking with Linda, Graves called Detective Scott Fisher and Captain Mike Talcott and they planned to meet at the sheriff's office. While Graves was driving back to the sheriff's office, dispatch informed him that Dial had arrived at the sheriff's office. Graves met with Dial and immediately noticed that both her eyes were "severely swollen," her right eye was swollen shut, her lips were blue and bruised, and she had blood all over her face, including fresh blood dripping from her nose, eyes, and hairline. Upon seeing her condition, Graves asked dispatch to call EMS.

Dial told Graves that Eckert was intoxicated, and he was upset so he beat her up with his hands and a wooden object. Dial said she snuck out of the house when Eckert fell asleep. Dial cried while she spoke and appeared to be scared. Based on this basic information, Graves referred the case to detectives for further investigation. Miami County Sherriff's Deputy Matthew Kelly took pictures of Dial's injuries, which were admitted at trial.

Miami County paramedic, Clay Weinaug, responded to the Sheriff's Office. Because of Dial's facial injuries, Weinaug took her to the Overland Park Regional Medical Center, the closest high level trauma facility. Emergency Physician David Jesse Brewer treated Dial in the emergency room. Brewer placed five staples on the head laceration and determined that Dial's lip did not require repair. Radiologist Wyatt Lee Hadley noticed that Dial had extensive scalp and facial swelling. He also saw some swelling near the side or back of Dial's skull.

Miami County Sheriff's Detective John Michael Douglass arrived at Overland Park Regional Hospital to meet with Dial. Early the next morning, after Dial received treatment, Douglass drove her back to the sheriff's office and took more pictures.

Douglass then held a more formal interview with Dial. She described to Douglass in detail the events of December 10, 2016.

After interviewing Dial, Douglass, along with Detective Garrett Hall, and Detective Timothy Brown, executed a warrant on Eckert's house. They noticed blood on the carpet in the living room and a bloody handprint. Brown also noticed a stick in the corner of the doorway leading to the bedroom, consistent with the stick Dial said Eckert hit her with. The stick had blood on it. In the bedroom, Douglass found a black knife, matching the description Dial gave. Douglass found blood and hair on the door leading from the bedroom to the porch. At the base of the door, Douglass saw pieces of plastic hangers. Douglass also located the bag Dial described she was packing that contained women's clothes. Hall found blood on the sheets and pillow of the bed. Hall also located a pair of men's jeans and a sock with blood on them. Douglass found the safe, which contained a loaded pistol. In the safe, law enforcement also found a wallet with Eckert's license, mail addressed to Eckert, a prescription medication bottle containing marijuana seeds with Eckert's name on it, and another container with marijuana seeds.

In the house's second bedroom, Douglass and Hall discovered a marijuana grow operation. In this room, Hall found various items later charged as felony drug paraphernalia with intent to manufacture including a propane tank and blower, plastic containers marked "plants," a tin tent, a light source, fans, a support pole for the tent and a timer for a humidifier, a ventilation system and pump, and water jugs. He also found nine healthy marijuana plants. The grow operation was confined to the second bedroom.

Douglass and Hall also found various items later charged as misdemeanor drug paraphernalia for personal use including two glass bongs, rolling papers, a roach clip, 10 pipes, a pink and black container to store marijuana, a green and black container to store marijuana, and a small green plastic container to store marijuana. These items were found in the living room and master bedroom.

5

On December 13, 2016, the State charged Eckert with aggravated kidnapping, attempted second-degree murder, aggravated assault, criminal threat, cultivation of marijuana, and possession with intent to use drug paraphernalia.

On December 14, 2016, Douglass took more photos of Dial to document the healing. Douglass contacted a Sexual Assault Nurse Examiner (SANE) nurse, to see if she could better document Dial's injuries. Jacqlynn Asherman, a SANE nurse, saw Dial. Dial complained of having trouble breathing and pain in her left side so Asherman consulted a physician who ordered x-rays. Asherman then documented Dial's various injuries. Radiologist Kavita Gorantla found Dial had an acute nondisplaced fracture on three of her ribs.

As part of the investigation, Lee's Summit Detective Lee Turner forensically examined three cell phones. On Eckert's phone, he found that a factory reset had been performed on December 11, 2016, at 2:25 a.m. Turner examined Linda's phone and found that her phone had contact with Eckert's phone, including a call from Eckert at 6:51 p.m. and a text message with a picture at 6:54 p.m. Linda's phone showed that she distributed the picture to others and then deleted the message. Turner could not conduct an extraction on the third phone because it was too heavily damaged.

On March 18, 2017, the State amended the complaint, charging Eckert with aggravated kidnapping, attempted second-degree murder or in the alternative aggravated battery, aggravated assault, criminal threat, cultivation of marijuana plants, 8 counts of felony possession of drug paraphernalia with intent to manufacture, and 21 counts of misdemeanor possession of drug paraphernalia for personal use.

6

*Jury trial and sentencing*

The district court held a four-day jury trial. The State called various law enforcement and medical professionals who testified to the above facts. Relevant to one of Eckert's issues on appeal, Hall explained that the propane tank he found in the grow room was connected to the blower by a hose and that in his experience, such an apparatus was used to heat marijuana plants. Hall admitted on cross-examination that he did not know whether there was any propane in the propane tank.

The State also called Linda who testified that she received a call from Eckert, although it did not sound like him, and that he told her that she needed to "'get up here and help bury this bitch.'" Linda testified that she believed Eckert meant that she needed to help him get Dial out of his life, not actually bury Dial. Linda also testified that she owned the safe in the bedroom, that only she knew the combination, and that the safe contained her pistol. When asked, Linda stated that she called the police about the picture, despite believing that Eckert was talking about their relationship, because she saw blood on Dial's neck. Linda testified that she still loved Eckert and would get back together with him if he would get his drinking under control.

Eckert called one witness, Miami County Sheriff's Sergeant Scott Fisher. Fisher testified that in 2015, he responded to a call from Eckert that there may have been an intruder at his house. When Fisher arrived and cleared the house, he found a tent, some lights, and ventilation equipment in a bedroom that Eckert claimed he planned to grow tomatoes in. Fisher testified that he did not see any drug paraphernalia in the house. Eckert then rested without testifying in his own defense.

During closing argument, Eckert conceded that he beat Dial up. He told the jury that it would be justified in finding him guilty of "some flavor of battery" and of the "pot stuff" but that he should not be found guilty of attempted murder or kidnapping. Eckert

7

claimed Dial lied about the attempted murder either so she would not be charged with her part in the pot farm or because she was jealous that Eckert was still married to Linda.

The district court instructed the jury. The jury found Eckert guilty of aggravated kidnapping, aggravated battery, aggravated assault with a deadly weapon, criminal threat, cultivation of marijuana, 8 felony counts of possession of drug paraphernalia with intent to manufacture and 17 misdemeanor counts of possession of drug paraphernalia for personal use.

The district court sentenced Eckert to a controlling 362 months' imprisonment and 36 months' postrelease supervision. The district court ordered Eckert to pay $22,610.29 in restitution and ordered Eckert to have no contact with Dial. Eckert timely appealed.

WAS THERE INSUFFICIENT EVIDENCE TO SUPPORT ECKERT'S CONVICTION OF AGGRAVATED KIDNAPPING?

Eckert first claims there was insufficient evidence to support his aggravated kidnapping conviction because the State failed to prove the confinement element. The State charged Eckert with aggravated kidnapping under K.S.A. 2015 Supp. 21-5408(a)(3) and (b), which is defined as "the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person . . . to inflict bodily injury or to terrorize the victim or another" and "bodily harm is inflicted upon the person kidnapped." Eckert asserts that because the infliction of bodily harm is the crime of battery and terrorizing Dial was the crime of criminal threat—and he was charged with both battery and criminal threat—his confinement of Dial was simply incidental to other crimes and not a distinct act to support his aggravated kidnapping conviction. Eckert relies on *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976) to support his argument.

8

The State counters that the Kansas Supreme Court and panels of this court have held that *Buggs* does not apply to Eckert's aggravated kidnapping conviction. The State then asserts that there was sufficient evidence to support his conviction because Eckert prevented Dial from leaving the house multiple times during the incident, caused her injury, and threatened to kill her.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Fitzgerald*, 308 Kan. 659, 666, 423 P.3d 497 (2018) (quoting *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 [2014]).

Eckert's argument relies on finding that the confinement element of kidnapping must be separate and distinct from the underlying crimes. In *Buggs*, the Kansas Supreme Court addressed the scope of the confinement element in relation to kidnapping done with the intent to facilitate the commission of any crime. 219 Kan. at 214. The court explained that the kidnapping statute was not meant to cover movements or confinements that were incidental to the commission of an underlying lesser crime. See 219 Kan. at 215. The *Buggs* court then enumerated a test for determining when confinement or movement was distinct enough to support a kidnapping charge in addition to the underlying lesser crimes. 219 Kan. at 216.

But *Buggs* did not address the type of kidnapping Eckert is convicted of. This distinction is important because the Kansas Supreme Court has held that the *Buggs* test does not apply to kidnapping done with the intent to inflict bodily injury or to terrorize the victim. See *State v. Burden*, 275 Kan. 934, Syl. ¶ 3, 69 P.3d 1120 (2003) ("The three-pronged test set forth in *State v. Buggs* . . . is discussed and held to apply only to a determination of whether a taking or confinement was to facilitate the commission of

9

another crime . . . ."). Thus, the *Burden* court refused to apply the *Buggs* test Eckert now relies on to the type of kidnapping Eckert committed.

Eckert acknowledges *Burden* but argues that it is wrongly decided. But this court is duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its earlier position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). There is no indication that the Kansas Supreme Court is departing from its position in *Burden*. See also, *State v. Charles*, No. 119,346, 2019 WL 3242199, *6 (Kan. App. 2019) (unpublished opinion) (rejecting identical argument and finding Burden controlling), *rev. denied* 311 Kan. 1047 (2020).

Disregarding Eckert's rejected *Buggs* argument, there was sufficient evidence to support Eckert's conviction. Taking the evidence in a light most favorable to the State, the evidence established: (1) Dial got up and tried to get to the living room to escape the house, but Eckert pulled her back by her hair; (2) Dial again broke free from Eckert's grasp only to be dragged back into the bedroom by her feet; (3) when Eckert's mother showed up, Eckert threatened to kill Dial and her family if she was not quiet; and (4) Dial could not leave the house until Eckert fell asleep. Eckert does not contest that the confinement occurred with the intent to inflict bodily harm or terrorize Dial and he did in fact inflict bodily injury on Dial. Thus, there was sufficient evidence to support Eckert's aggravated kidnapping conviction.

### ARE ECKERT'S 8 FELONY AND 17 MISDEMEANOR CONVICTIONS FOR POSSESSION OF DRUG PARAPHERNALIA MULTIPLICITOUS?

The jury found Eckert guilty of 25 counts of possession of drug paraphernalia. Eckert was convicted of eight counts of violating K.S.A. 2015 Supp. 21-5709(b)(1), which criminalizes the possession "with intent to use any drug paraphernalia to . . . [m]anufacture, cultivate, plant, propagate, harvest, test, analyze or distribute a controlled

10

substance." Those convictions stemmed from his possession of the propane, the blower, the water jugs, the lights, the fans, the tent, the ventilation system, and the pump. Eckert was convicted of 17 counts of violating subsection K.S.A. 2015 Supp. 21-5709(b)(2), which criminalizes the possession "with intent to use any drug paraphernalia to . . . store, contain, conceal, inject, ingest, inhale or otherwise introduce a controlled substance into the human body." Those charges stemmed from his possession of two bongs, rolling papers, 10 pipes, a roach clip, and three storage containers.

Eckert argues that his 25 convictions for possession of drug paraphernalia are multiplicitous because the convictions rely on multiple items of paraphernalia that he used for the same purpose as part of a unitary course of conduct. Thus, Eckert asserts that he should be convicted only of one count of felony possession of drug paraphernalia under K.S.A. 2015 Supp. 21-5709(b)(1) and one count of misdemeanor possession of drug paraphernalia under K.S.A. 2015 Supp. 21-5709(b)(2).

Eckert correctly asserts he raised this issue below, in his motion to dismiss, and that the district court denied that motion. This court applies unlimited review to multiplicity challenges. *State v. Gonzalez*, 311 Kan. 281, 295, 460 P.3d 348 (2020).

"The Double Jeopardy Clause prevents a defendant from being punished more than once for the same crime." 311 Kan. at 296. Multiplicity occurs when a single offense is charged as several offenses in a charging document. 311 Kan. at 296. Multiplicity involves a two-part test, determining first whether the convictions arise from the same conduct, and second whether by statutory definition there is only one offense. 311 Kan. at 296. Under the first prong, the court determines whether "the conduct is discrete," meaning the convictions do not arise from the same conduct. 311 Kan. at 296. But if the two convictions arise from the same act or transaction then the conduct is unitary, and the court must consider the second prong. 311 Kan. at 296. Under the second prong, "[i]f the convictions are for several violations of a single statute, a unit of prosecution test applies,

11

meaning the court examines the relevant statute to determine what the Legislature intended as the allowable unit of prosecution." 311 Kan. at 296. There can only be one conviction for each unit of prosecution defined by the Legislature. *State v. Schoonover*, 281 Kan. 453, 472, 133 P.3d 48 (2006). The unit of prosecution is not necessarily dependent on whether there is a single physical action or a single victim; instead the key is the nature of the conduct proscribed. 281 Kan. at 472. The court applies the rule of lenity when the unit of prosecution is not clearly discernable. See 281 Kan. at 472.

Determining the unit of prosecution involves statutory interpretation. This court's analytical framework for statutory construction is well known:

"'[W]e first attempt to give effect to the intent of the legislature as expressed through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to express language, rather than determine what the law should or should not be. Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute. Stated yet another way, a clear and unambiguous statute must be given effect as written. If a statute is clear and unambiguous, then there is no need to resort to statutory construction or employ any of the canons that support such construction.'" *State v. Ayers*, 309 Kan. 162, 163-64, 432 P.3d 663 (2019).

Eckert asserts that all his convictions arise out of the same conduct or transaction—either growing marijuana in his house for the felony convictions or consuming marijuana for the misdemeanor convictions—thus fulfilling the first prong. The State concedes that the first prong of the multiplicity test is met.

Thus, the question is what the Legislature intended the unit of prosecution for the offense of possession of drug paraphernalia to be. Eckert's argument is that the proper unit of prosecution turns on the intent of the defendant and because he had only one

12

intent—to manufacture marijuana for the felony counts and to introduce marijuana into his body for the misdemeanor counts—he can be convicted only of one felony violation and one misdemeanor violation. The State counters that because the statute uses the word "any" before the term "drug paraphernalia," the proper unit of prosecution is one conviction for each item of paraphernalia possessed.

Eckert cites *State v. Thompson*, 287 Kan. 238, 200 P.3d 22 (2009), to support his argument. Thompson was convicted of two counts of violating K.S.A. 65-7006(a) (Furse 2002)—which stated: "'It shall be unlawful for any 287 Kan. person to possess ephedrine, pseudoephedrine, red phosphorus, lithium metal, sodium metal, iodine, anhydrous ammonia, pressurized ammonia or phenylpropanolamine, or their salts, isomers or salts of isomers with intent to use the product to manufacture a controlled substance'"—based on his possession of pseudoephedrine and lithium metal. 287 Kan. at 243. The Kansas Supreme Court explained that the mere possession of one or more of the enumerated items in the statute, without the requisite intent to manufacture, is not illegal. 287 Kan. at 248. Thus, the court found that Thompson's convictions were multiplicitous because the Legislature failed to define whether the possession of each item for a single manufacturing operation could be prosecuted separately. 287 Kan. at 251-52. The court reasoned:

> "[U]nder the plain language of K.S.A. 65-7006(a), a crime occurs (1) whenever a person possesses any one of the listed items (2) with the intent to manufacture a controlled substance. It is the combination of these elements that forms the crime, and a unitary intent to manufacture forms the unit of prosecution. Consequently, the nature of the conduct proscribed in K.S.A. 65-7006(a), the required intent, and the rule of lenity require the conclusion that only a single unit of prosecution exists in K.S.A. 65-7006(a) if a defendant's conduct is unitary, even if the defendant possesses several of the items listed in the statute." 287 Kan. at 252.

13

More recently, a panel of this court addressed a multiplicity argument much like Eckert's and distinguished *Thompson*. In *State v. Booton*, No. 113,612, 2016 WL 4161344, *8-9 (Kan. App. 2016) (unpublished opinion), the panel considered Booton's argument that his three misdemeanor convictions for possession of drug paraphernalia under K.S.A. 2015 Supp. 21-5709(b)(2)—based on possession of a pipe, baggies, and a scale—were multiplicitous. Booton raised the same argument as Eckert's, asserting that based on *Thompson* and because he possessed all the items with the unitary intent of storing, containing, or introducing drugs into his body, he could be convicted only of one count. *Booton*, 2016 WL 4161344, at *9.

The panel found *Thompson* distinguishable because the possession of drug paraphernalia statute, unlike the statute at issue in *Thompson*, criminalized the possession of "'any drug paraphernalia.'" *Booton*, 2016 WL 4161344, at *10. The panel reasoned that the Legislature's use of the word "any" evidenced its intent to permit multiple units of prosecution based on possession of multiple items. 2016 WL 4161344, at *10. In support of this interpretation of the term "any," the panel cited three unpublished cases each finding the Legislature's use of the term "any" allowed for multiple convictions based on possession of multiple items. 2016 WL 4161344, at *10; see also *State v. Hulsey*, No. 109,095, 2014 WL 4627486, at *11-12 (Kan. App. 2014) (unpublished opinion) (use of term "any" in statute criminalizing possession of child pornography supports separate convictions for multiple images); *State v. Odegbaro*, No. 108,493, 2014 WL 2589707, at *9 (Kan. App. 2014) (unpublished opinion) (use of term "any" in statute criminalizing making a false information supports separate convictions for multiple written instruments), *abrogated on other grounds by State v. Ward*, 307 Kan. 245, 408 P.3d 954 (2018); *State v. Odell*, No. 105,311, 2013 WL 310335, at *8 (Kan. App. 2013) (unpublished opinion) (use of term "any item" in statute criminalizing traffic in contraband in a correctional institution provides for multiple units of prosecution in cases involving multiple items of contraband). The panel concluded that because Booton was in possession of "three distinct items of drug paraphernalia that, by statutory definition,

14

constitute separate offenses" his convictions were not multiplictous. *Booton*, 2016 WL 4161344, at *10.

But *Booton* is not persuasive. First, the authorities the *Booton* panel relied on—to support its assertion that the term "any" evidenced a legislative intent for the unit of prosecution to be based on the number of items possessed—are distinguishable from the statute at issue in *Booton* and here. Second, assuming the unit of prosecution depended on the term "any," the *Booton* panel failed to consider that the term "any" makes the statute ambiguous at best, in which case the rule of lenity should apply. Third, it relies on the term "any" as determining the proper unit of prosecution. But the isolation of and reliance on a single word for determining a multiplicity issue without reading the entire provision has been disproved of by the Kansas Supreme Court. See *State v. Hood*, 297 Kan. 388, 393, 300 P.3d 1083 (2013) ("The panel's isolation and elevation of the term 'owner' in the mens rea element of the theft definition creates a misdirection as to the nature of the crime."). When K.S.A. 2015 Supp. 21-5709(b)—the statute Eckert is convicted of violating—is read as a whole, the nature of the crime seems to focus on his intent for possessing or using the drug paraphernalia, not the quantity of paraphernalia possessed.

As Eckert asserts, interpretation of the possession of drug paraphernalia statute requires reference to the definition of drug paraphernalia in K.S.A. 2020 Supp. 21-5701(f):

> "'Drug paraphernalia' means *all equipment and materials of any kind* that are used, or primarily intended or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance and in violation of this act." (Emphasis added.)

15

Eckert points to the italicized language and asserts that the statute refers to the items in a collective sense and focuses on their purpose. Eckert's argument is persuasive and undermines the *Booton* panel's reliance on other cases interpreting the term "any" to determine the unit of prosecution. For instance, in *Odell*, 2013 WL 310335, at *8, the contraband statute at issue defined contraband as "'any item.'" The panel found that "[g]iven the plain meaning of the legislature's use of the singular noun 'item' convinces us there is one unit of prosecution for each item of contraband." 2013 WL 310335, at *8.

In *Hulsey*, the panel found the defendant's 89 counts of sexual exploitation of child were not multiplicitous despite all 89 pictures being found on the defendant's computer. The statute at issue criminalized "'possessing any visual depiction, . . . where such visual depiction of a child under 18 years of age is shown or heard engaging in sexually explicit conduct with intent to arouse or satisfy the sexual desires or appeal to the prurient interest of the offender, the child or another.'" 2014 WL 4627486, at *9. The panel reasoned that because the statute criminalized "'any visual depiction'" rather than an earlier version that criminalized "'any film, photograph, . . . computer hardware, software, floppy disk or any other computer related equipment . . . that contains or incorporates in any manner any film, photograph, negative, photocopy, video tape or video laser disk in which a visual depiction of a child under 18 years of age is shown or heard engaging in sexually explicit conduct,'" the Legislature intended each image to be separately criminalized. 2014 WL 4627486, at *11. In *Odegbaro*, 2014 WL 2589707, at *9, the statute criminalized making "'any written instrument'" with knowledge that the information was false.

The statutes at issue in these three cases can be distinguished from the statute at issue in *Booton* and here. In the cases discussed above, the term "any" modified a single noun: "item," "visual depiction," or "instrument." Whereas here, the term "any" modifies the term "drug paraphernalia," which can be either a singular or a plural noun. This distinction, while seemingly minor, makes the statute ambiguous if the multiplicity question comes down to the definition of the term "any."

16

Webster's New World College Dictionary 64 (5th ed. 2014) defines the adjective "any" as "one, no matter which, of more than two"; "some, no matter how much or how little, how many, or what kind"; "without limit"; "even one; the least amount or number of"; or "every." Based on these definitions, the statute could criminalize the use or possession with intent to use "some, no matter . . . how many, or what kind" of drug paraphernalia (plural) to manufacture a controlled substance. It could also criminalize the use or possession with intent to use "every" drug paraphernalia (singular) to manufacture a controlled substance. The first interpretation supports Eckert's argument that the quantity of items does not matter while the second interpretation favors the State. Both are reasonable interpretations giving the term "any" its plain meaning. Thus, if this issue boils down to interpreting the term "any," then at a minimum the statute is ambiguous. And when a statute is ambiguous, then the rule of lenity must be applied, and the statute is construed in Eckert's favor. See *Schoonover*, 281 Kan. at 472.

That said, this issue can more readily be disposed of without focusing solely on the term "any." Because the key to the unit of prosecution is the nature of the conduct proscribed, the statute should be examined as a whole to determine the proper unit of prosecution. As mentioned above, by definition paraphernalia "means all equipment and materials of any kind that are used, or primarily intended or designed for use in planting . . . or otherwise introducing into the human body a controlled substance . . . ." K.S.A. 2020 Supp. 21-5701(f). The statute then enumerates items considered "'[d]rug paraphernalia,'" but explicitly states that the list is not exhaustive. For example, the term includes "[k]its used or intended for use in planting"; "containers and other objects used or intended for use in storing or concealing controlled substances"; and "objects used or primarily indented or designed for use in ingesting . . . marijuana . . . into the human body, . . . such as . . . water pipes, bongs or smoking pipes . . . ." K.S.A. 2020 Supp. 21-5701(f)(1), (f)(10), and (f)(12)(B). These items are all defined in the plural, suggesting, as Eckert asserts, that drug paraphernalia is meant to refer to all items collectively that fit the definition. In fact, by its nature, a "kit" would contain multiple items.

17

More importantly, it is not the possession of any particular item that is criminal but only possession of those items with the intent to use those items in a way criminalized by the statute:  to "[m]anufacture, cultivate, plant, propagate, harvest, test, analyze or distribute a controlled substance" or to "store, contain, conceal, inject, ingest, inhale or otherwise introduce a controlled substance into the human body." See K.S.A. 2020 Supp. 21-5709(b). In fact, often in drug paraphernalia cases, the objects supporting the conviction could have legitimate uses—such as syringes, storage containers, propane tanks, or scales. *State v. Johnson*, No. 111,215, 2015 WL 4366448, at *5 (Kan. App. 2015) (unpublished opinion). Thus, the nature of the conduct prohibited by the statute seems to focus on the possession of items for the purposes listed in the statute, not on the possession of the items themselves, the character or nature of the items possessed, or even the number of items possessed.

This interpretation is bolstered by reading the severity levels of the offense:

"(2) violation of subsection (b)(1) is a:
(A) Drug severity level 5 felony, except as provided in subsection (e)(2)(B); and
(B) class A nonperson misdemeanor if the drug paraphernalia was used to cultivate fewer than five marijuana plants;
"(3) violation of subsection (b)(2) is a class A nonperson misdemeanor" K.S.A. 2015 Supp. 21-5709(e).

The difference in punishment between subsection (b)(1) and (b)(2) seems to focus on whether the defendant intends to use the object to support his or her own personal use of a controlled substance or to support a wider operation, with personal use being punished less severely. The severity level of possession of paraphernalia to manufacture, cultivate, plant, propagate, harvest, test, analyze or distribute a controlled substance is also differentiated depending on the type and size of the operation—i.e., if the items are used to cultivate less than five marijuana plants then the offense is a misdemeanor, but if the items are used to cultivate more than five marijuana plants or any other type of

18

controlled substance then the offense is a felony. The severity level does not depend on the amount or type of paraphernalia possessed. This differentiation, between the defendant's intended use—whether personal or for wider distribution—and between the type and size of the operation support finding that the nature of the conduct proscribed focuses on the defendant's purpose for possessing or using the drug paraphernalia.

Finally, assuming there is ambiguity in the statute on whether the term "drug paraphernalia" is singular or plural, Eckert's interpretation of the unit of prosecution is also the only one that would avoid unreasonable results. See *State v. Keel*, 302 Kan. 560, 574, 357 P.3d 251 (2015) (stating the courts must construe statutes to avoid unreasonable or absurd results). Under the State's argument for the unit of prosecution, a defendant could be charged separately for each item of paraphernalia found in one place even if the paraphernalia were possessed for a single purpose. There is no limit to how any set of items could be charged—i.e., if a defendant had 100 baggies which he or she intended to use to distribute a controlled substance, each baggie would support a separate conviction.

Although the unit of prosecution test focuses on statutory analysis and not the facts of the case, the facts here present a good illustration of the unreasonable result if the State's interpretation of the statute is correct. Three of Eckert's misdemeanor convictions result from separate storage containers found in the house. Two of his felony convictions result from a propane tank and a blower, but the propane tank was connected to the blower to make a heater when they were found. If the unit of prosecution depends on the number of items possessed, in a grow operation, such as the one here, the State can advance as many charges as it wants based on how it groups or even separates items.

In sum, at a minimum, K.S.A. 2020 Supp. 21-5709(b) is ambiguous on the unit of prosecution because the term "drug paraphernalia" can be either singular or plural and it must be construed in Eckert's favor under the rule of lenity. Alternatively, the plain language of the statute supports finding that the unit of prosecution is based on Eckert's

19

intent for possessing the drug paraphernalia, not the quantity of paraphernalia he possessed. Either way, his 25 convictions for possession of drug paraphernalia are multiplicitous because despite the presence of multiple items of paraphernalia at his house, he only had one purpose to "[m]anufacture, cultivate, plant, propagate, harvest, test, analyze or distribute [marijuana]" and one purpose to "store, contain, conceal, inject, ingest, inhale or otherwise introduce [marijuana] into [his] human body." See K.S.A. 2020 Supp. 21-5709(b). Eckert can be convicted of only one count of felony possession of drug paraphernalia under K.S.A. 2015 Supp. 21-5709(b)(1) and one count of misdemeanor possession of drug paraphernalia under K.S.A. 2015 Supp. 21-5709(b)(2). The other 23 possession of drug paraphernalia convictions are reversed and the sentences for those convictions are vacated.

Eckert's next claim on appeal is there was insufficient evidence to support his felony convictions of possession of drug paraphernalia in count six, based on the propane tank, and count seven, based on the blower. We need not address this issue as a result of our disposition of Eckert's multiplicity claim. There was sufficient evidence to support Eckert's conviction of one count of felony possession of drug paraphernalia.

DID THE DISTRICT COURT ERR IN DENYING ECKERT'S
REQUEST FOR A VOLUNTARY INTOXICATION INSTRUCTION?

Eckert next claims the district court erred in failing to give his requested voluntary intoxication instruction. Eckert requested the voluntary intoxication instruction, but the district court denied his request, finding the evidence did not establish that he was so intoxicated he did not know what he was doing.

The State concedes that a voluntary intoxication instruction was legally appropriate for the specific intent crimes charged. But the State asserts that the district court correctly found that Eckert did not show that the instruction was factually

20

appropriate because the evidence did not establish that he was so impaired he could not have formed the requisite intent.

This court employs a multi-step process to review claims of jury instruction error. First, this court must decide whether the issue was preserved. *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018). Because Eckert requested a voluntary intoxication instruction, he properly preserved the issue. Second, this court must decide whether an error occurred by determining whether the requested instruction was legally and factually appropriate. In addressing the first two steps, this court exercises unlimited review. 308 Kan. at 1451. If error is found, this court must then determine whether the error is reversible. 308 Kan. at 1451.

Both parties correctly assert that a voluntary intoxication defense instruction is legally appropriate for specific intent crimes like aggravated kidnapping. See *State v. Gallegos*, 313 Kan. 262, 271, 485 P.3d 622 (2021) ("voluntary intoxication may negate the intent element of a specific intent crime"); K.S.A. 2020 Supp. 21-5205(b) ("An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."); *State v. Mattox*, 305 Kan. 1015, 1025, 390 P.3d 514 (2017) (stating aggravated kidnapping is a specific intent crime).

Thus, the question is whether a voluntary intoxication instruction was factually appropriate. The Kansas Supreme Court has stated that evidence of mere consumption of an intoxicant does not mean that the district court should give a voluntary intoxication instruction. *Gallegos*, 313 Kan. at 271. Instead, the court has "consistently interpreted the statute to require the evidence to show proof of impairment," meaning there must be evidence of "'intoxication to the extent of impairing the ability to form the requisite

21

intent.'" 313 Kan. at 271. The court has provided examples of such evidence: "loss of the ability to reason, to plan, to recall, or to exercise motor skills." 313 Kan. at 271.

Eckert argues that the evidence showed the instruction was factually appropriate because Dial testified that Eckert was intoxicated, that he had a drinking problem, and that he became violent when he drank. Eckert also points to the fact that he had been drinking all day; consumed marijuana; dropped a joint in the car on the way back to his house, which could be attributed to his intoxication; mumbled to himself; had to stop beating Dial to throw up; and that he did not sound like himself when he called Linda.

But merely being intoxicated, mumbling to himself, and getting sick do not establish that he could not form the requisite intent. See, e.g., *State v. Brown*, 291 Kan. 646, 656-57, 244 P.3d 267 (2011) (finding evidence that defendant consumed alcohol and was mumbling insufficient to show defendant was so intoxicated he could not form the requisite intent). These actions are merely symptoms of being intoxicated. They do not establish that Eckert was unable to reason, to plan, to recall or to exercise motor skills during the incident and they do not establish he could not form the required intent.

Instead, the record supports finding that Eckert could form the requisite intent: Eckert called and texted Linda during the incident about what he was doing to Dial and what he had planned; Eckert instructed Dial to be quiet and threatened her when his mother came to the door; Eckert performed a factory reset on his cell phone shortly after the incident; and when he was arrested, Eckert told officers that the safe was Linda's. These facts show Eckert knew what he was doing during the incident, that he could recall the incident, and that he knew he needed to avoid detection. Eckert did not testify to provide direct evidence that he was so intoxicated he could not form the intent to commit his crimes. Based on the totality of the record, we conclude the district court did not err in denying Eckert's request for a voluntary intoxication instruction.

## DID CUMULATIVE ERROR DEPRIVE ECKERT OF A FAIR TRIAL?

Eckert next claims he was denied his right to a fair trial based on the cumulative effect of the above alleged errors. The State counters that there were no errors and even if there were, Eckert's convictions were overwhelmingly supported by the evidence.

A cumulative error analysis aggregates all errors and determines whether the combined effect of the errors violated the defendant's right to a fair trial. *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011). The only error we have identified was the multiplicity of drug paraphernalia convictions, and we are granting Eckert relief on that claim. The cumulative error analysis does not apply when multiple errors have not been found. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018).

## IS ECKERT'S CRIMINAL RESTITUTION JUDGMENT UNCONSTITUTIONAL?

Eckert next claims, for the first time on appeal, that his criminal restitution judgment, imposed under K.S.A. 2017 Supp. 21-6604(b)(1), is unconstitutional under section 5 of the Kansas Constitution Bill of Rights and the Sixth Amendment to the United States Constitution. The State asserts that Eckert cannot raise a constitutional challenge for the first time on appeal and also that the claim fails on the merits.

Generally, this court will not consider a constitutional issue raised for the first time on appeal. *State v. Arnett*, 314 Kan. 183, 496 P.3d 928 (2021). There are three exceptions to the general rule including where "'consideration of the theory is necessary to serve the ends of justice or to prevent [a] denial of fundamental rights.'" 314 Kan. at 185. Eckert correctly asserts that this court may hear the issue under the exception for preventing the denial of fundamental rights. See 314 Kan. at 185 (addressing this issue for the first time on appeal under the exception for preventing the denial of fundamental rights).

The Kansas Supreme Court recently reviewed this exact challenge to restitution orders. In *Arnett*, the court first held that the criminal restitution statutes do not violate the Sixth Amendment to the United States Constitution. 314 Kan. at 186-88. The court then examined whether criminal restitution violated section 5 of the Kansas Constitution Bill of Rights. The court explained that the relevant test required it to determine whether juries would have decided criminal restitution before the adoption of the Kansas Constitution. 314 Kan. at 189. The court explained that the inquiry was not straightforward because criminal restitution did not exist at common law, and victims were only allowed to recover damages in a civil suit before a jury. 314 Kan. at 189-90. After extensive discussion, the court found that the current criminal restitution statutes, which allow a judge to determine damages, but then convert the damages into a civil judgment, bypassed the traditional function of a jury to determine civil damages and thus implicated section 5. 314 Kan. at 194.

But the court found the remedy was not to declare the criminal restitution statutes void but to sever the unconstitutional provisions that equated a criminal restitution order to a civil judgment. 314 Kan. at 195-96. In doing so, the court held that restitution may still be imposed by a judge, instead of a jury, as part of sentencing. 314 Kan. at 196. Thus, Eckert has no right to have his criminal restitution judgment vacated.

## WAS THE NO-CONTACT ORDER AN ILLEGAL SENTENCE?

Finally, Eckert claims the district court imposed an illegal sentence when it issued a no-contact order after sentencing him to prison. The State concedes the court's no-contact order exceeded its sentencing authority. See *State v. Alcala*, 301 Kan. 832, 835, 348 P.3d 570 (2015) ("A no-contact order is a probation condition. It is inappropriate to combine a no-contact order with a prison sentence because to do so exceeds a sentencing court's authority . . . .") Both parties agree the proper remedy is to vacate the no-contact

order but leave the rest of Eckert's sentence intact. See 301 Kan. at 835 ("'The appropriate remedy is to vacate the no-contact order but leave the remainder of the sentence intact.'").

CONCLUSION AND REMAND ORDER

We agree with Eckert that his 25 convictions for possession of drug paraphernalia are multiplicitous. The evidence supports only one conviction for felony possession of drug paraphernalia under K.S.A. 2015 Supp. 21-5709(b)(1) and one conviction for misdemeanor possession of drug paraphernalia under K.S.A. 2015 Supp. 21-5709(b)(2). The other 23 possession convictions are reversed and the sentences for those convictions are vacated. The no-contact order is also vacated. Eckert's remaining convictions and restitution order are affirmed. The case is remanded for resentencing based on the proper convictions.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.