STATE OF KANSAS, *Appellee*, v. CHARLES L. BUGGS, JR., *Appellant*.

No. 47,950

STATE OF KANSAS, *Appellee*, v. RONALD G. PERRY, *Appellant*.

(547 P. 2d 720)

Opinion filed March 6, 1976.

*Jack Peggs*, of Smith, Shay, Farmer and Wetta, of Wichita, argued the cause and was on the brief for appellant, Charles L. Buggs, Jr.

*Larry Shoaf*, of McDonald, Tinker, Skaer, Quinn and Herrington, of Wichita, argued the cause and was on the brief for appellant, Ronald G. Perry.

*Stephen E. Robison*, assistant district attorney, argued the cause, and *Curt T. Schneider*, attorney general, *Keith Sanborn*, district attorney, and *Clifford L. Bertholf*, assistant district attorney, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Foth, C.: Charles L. Buggs, Jr. and Ronald G. Perry have separately appealed from convictions of multiple felony counts in the district court of Sedgwick county. Buggs was convicted of aggravated kidnapping, kidnapping, aggravated robbery, rape, and aggravated weapons violation; Perry was convicted of kidnapping and aggravated robbery. All charges arose out of a single series of transactions, the defendants were jointly charged in one information and were jointly tried, and in their appeals they raise (with one

minor exception) substantially identical claims of error. The appeals are therefore consolidated for decision.

The facts are basically undisputed: On April 12, 1974, Mrs. JoAnn Penner and her seventeen year old son Larry were working at the Penners' Dairy Queen store in Wichita. At 11:00 p. m. they closed the store for the evening. Just prior to leaving Mrs. Penner put the day's receipts, over $300, into a bank bag and placed the bag inside her purse. As she and her son were outside the store after locking the back door, defendants approached. Perry said he had a gun and told the Penners "not to try anything." (The "gun," it later developed, was merely a piece of pipe taped to a handle and was not functional.) Mrs. Penner was directed to unlock the door and get back inside; she did so, followed by her son Larry and the defendants Buggs and Perry. After all were inside Mrs. Penner was asked where the money was; she said it was in her purse and handed it to Perry.

At this point defendants forced both Penners to lie down on the floor, Larry face down, Mrs. Penner on her back with her face to the wall. Buggs then removed Mrs. Penner's undergarments and proceeded to rape her. She testified she did not resist because she feared for the life of her son, who was guarded by Perry wielding the "gun."

In the meantime, two Wichita police officers arrived at the store in response to a silent alarm, which had been set off when Mrs. Penner unlocked the back door. One of them testified that upon arriving at the store he looked through a window and saw Buggs, with Mrs. Penner underneath, holding a knife at the side of her throat. The officer called out, and then circled the building in an attempt to enter. Buggs thereupon released Mrs. Penner, who ran and opened the back door. When Buggs ran to the same door he was apprehended by the entering officer. Perry was found in the restroom, along with the money bag and the "gun." A knife with a six inch blade, a pair of black leather gloves, and a ski mask were found in the area where Buggs and Mrs. Penner had been. Mrs. Penner testified that she first saw the knife when she got up after Buggs released her.

One of the officers testified without objection to a conversation with Buggs early the following morning, after his rights had been explained to him and a waiver signed. In that conversation Buggs protested that he didn't get any money from the robbery, but admitted the rape at knife point.

Perry took the stand in his own behalf. He testified to planning the robbery with Buggs, but disclaimed any part in the rape. He told of accosting the Penners outside the Dairy Queen, telling them he had a gun, directing Mrs. Penner to unlock the door and go back inside, asking for the money, taking the bank bag from Mrs. Penner, and of trying to hide the money and "gun" in the restroom.

The jury convicted only Buggs of the aggravated kidnapping and rape of Mrs. Penner; it acquitted Perry of both those charges. Both defendants were convicted of the kidnapping (without harm) of Larry Penner, and both were convicted of aggravated robbery. As to the last charge, it should be noted that the "dangerous weapon" relied on by the state to make the robbery aggravated under K. S. A. 21-3427 was the knife employed by Buggs, and not the homemade "gun" brandished by Perry. The knife also furnished the basis for the aggravated weapons violation charge against Buggs, who had been convicted of rape in 1971 and released from the reformatory in 1973.

Before proceeding to defendants' main point on appeal we shall dispose of their secondary contentions. They first contend the trial court should have instructed on the lesser included offenses of simple robbery and attempted robbery. The trial court had a duty to so instruct only if the evidence would have justified a conviction of one of those offenses. *State v. Masqua*, 210 Kan. 419, 502 P. 2d 728.

Looking first to the claimed "attempt," we find the term defined in K. S. A. 21-3301 (1):

"(1) An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."

Robbery, in turn, is defined in K. S. A. 21-3426:

"Robbery is the taking of property from the person or presence of another by threat of bodily harm to his person or the person of another or by force."

The completed crime of robbery is thus the "taking" of property from the person by the proscribed means; an "attempt" to commit robbery occurs only when the taking is not accomplished. Here all the evidence is that the bank money bag was "taken" from Mrs. Penner by Perry, and later removed by him to the restroom. There is no evidence to the contrary. The robbery was complete when Mrs. Penner handed over the bag, and there was no call for an instruction on an attempt.

The contention that the robbery was simple and not "aggravated" rests on the dual proposition that the "gun" was not a dangerous

weapon and that the presence of the knife was not known to either of the Penners until after the police arrived.

Aggravated robbery is defined in K. S. A. 21-3427:

"Aggravated robbery is a robbery committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery."

The statute requires only that the robber be "armed with" a dangerous weapon, not that he use it or that the victim be aware of its presence. The mere presence of the weapon makes the crime aggravated—presumably because of the increased danger of personal harm the legislature foresaw from such presence, whether the weapon is used or not. As previously noted, the harmless "gun" was not an element in the charge, but only the knife. The knife was seen in Buggs' hand by the officer looking in the window, seen by the Penners after they got up from the floor, and was photographed and picked up by other officers. Although Perry professed no prior knowledge of the knife's presence, the crime actually committed was aggravated robbery and he either aided and abetted in that crime or nothing. There was no evidence but that Buggs was "armed" with the knife and that it was a dangerous weapon; that is all that was required to make the robbery "aggravated" under 21-3427. There was therefore no necessity for an instruction on simple robbery.

Secondly, both defendants claim they should have been granted a new trial because of alleged misconduct on the part of a juror. At the hearing on the motion for new trial counsel for Buggs asserted that he had observed a female juror carrying on by looks and glances a "flirtation" with one of the police officers who testified and who sat at the counsel table with the prosecutor. This went on, counsel said, for the first three days of the trial. On the third day he discussed it with Perry's attorney, who hadn't noticed it, and it was agreed between defense counsel that if it continued on the fourth day they would bring it to the court's attention. The officer wasn't in court on the fourth day, so the first time the alleged misconduct was brought up was on the motion for new trial.

Our rule in such a situation is clear:

"Where alleged juror misconduct claimed as prejudicial is known by the party or his counsel prior to rendition of a verdict, and no objection is made, nor the matter brought to the court's attention, the party cannot later assert the misconduct as grounds for a new trial." (*Roy v. State*, 213 Kan. 30, 514 P. 2d 832, Syl. ¶ 4.)

The reasons for the rule are equally clear. If the alleged misconduct is brought to the court's attention a hearing may be held and the situation remedied, if that is possible. If not, a mistrial may be declared immediately without wasting the time and expense required to complete the trial. The rule is a corollary of the contemporaneous objection rule as to evidence (K. S. A. 60-404; *State v. Estes,* 216 Kan. 382, 532 P. 2d 1283) and the requirement of an objection to erroneous instructions (K. S. A. 60-251 [*b*]; *Apperson v. Security State Bank,* 215 Kan. 724, 528 P. 2d 1211). A party is not permitted to remain silent in the face of known error, gamble on the verdict, and show his hole card only if he loses.

A third point, raised by Buggs alone, goes to the use of his prior conviction for rape as an element of the aggravated weapons violation charge. To establish its charge under K. S. A. 21-4202 it was incumbent on the state to prove that Buggs knowingly possessed the dangerous knife with intent to use it unlawfully against another (*i. e.,* to prove an "unlawful use of weapons" under K. S. A. 21-4201), and to prove that the offense occurred within five years after Buggs' conviction of, or release from imprisonment for, a felony.

Buggs first urges that the prior conviction could not be admitted into evidence against him because it was had on a plea of *nolo contendere.* Under K. S. A. 22-3209 (2) when a plea of *nolo contendere* is accepted "a finding of guilty may be adjudged thereon." While the plea itself, unlike a plea of guilty, may not be used "as an *admission* in any other action based on the same act" (*ibid.,* emphasis added), for all other purposes a conviction based on a plea of *nolo contendere* is just like any other conviction. 21 Am. Jur. 2d, *Criminal Law,* § 502, p. 494; 22 C. J. S., *Criminal Law,* § 425 (4), p. 1205; Anno. Plea of Nolo Contendere, 89 A. L. R. 2d 540, 604.

Buggs also complains that no instruction was given limiting the purposes for which the jury could consider his prior conviction. He alleges unusual prejudice because the prior conviction was for rape, a crime for which he was currently being tried. The complaint is disposed of by *State v. Knowles,* 209 Kan. 676, 498 P. 2d 40, Syl. ¶ 3:

"Where proof of a previous conviction is an essential element of a crime charged, failure to give an instruction limiting the purpose for which such conviction may be considered is not reversible error in the absence of a request."

The prior conviction here was an element of the crime charged. Buggs made no objection to its admission into evidence, requested no limiting instruction, and made no objection to the instructions

given. If he foresaw prejudice it was incumbent on him to make that fact known. Under *Knowles*, he cannot now complain.

The defendants' main point on appeal is that their conduct did not constitute a "kidnapping" of either Larry or Mrs. Penner. It is defendants' contention that the movement and confinement of both victims were only "minor and inconsequential," and were "merely incidental" to the real crimes of robbery and rape. They point out that every robbery and every rape is accompanied by some movement or at least some detention of the victim. To construe our kidnapping statute so as to cover their conduct here, they say, is to convert every robbery and every rape into the more serious offense of kidnapping. And, they say, to permit their convictions for kidnapping in addition to the robbery and rape is in each instance to carve two offenses out of what is essentially one.

We rejected similar contentions when made under our former kidnapping statute, K. S. A. 21-449. In *State v. Brown*, 181 Kan. 375, 312 P. 2d 832, we held that a charge of first degree kidnapping with harm was properly joined with a charge of rape where both charges arose out of one transaction. The elements of the two crimes were different, although the rape supplied the requisite bodily harm for the kidnapping. In that case we also reviewed at length the history of kidnapping from the time of Moses through the common law, culminating in the federal Lindbergh law and the then current state kidnapping statutes. We observed that "kidnapping" has a recognized meaning:

". . . Both under the common law and under a statute, unless clearly modified, it means to take and carry away any person by unlawful force or by fraud, and against his will." (*Id.* at 388.)

*Brown* was followed by *State v. Ayers*, 198 Kan. 467, 426 P. 2d 21, another kidnap-rape case in which the main thrust of the attack was on the amount of asportation required rather than on the alleged duplicity of the counts. In *Ayers* the victim was taken from a car to a shelter house some eleven feet away and there raped. Referring to *State v. Brown*, supra, we said:

". . . In *Brown*, we considered the words of the statute (21-449, *supra*), as well as common-law language and said 'kidnap,' means to take and carry away any person by unlawful force or fraud and against his will. We attached no other requirements such as a minimum distance of asportation. It is the fact, not the distance, of forcible removal of the victim that constitutes kidnapping. 1 Am. Jur. 2d, Abduction and Kidnapping, § 18, p. 172. See, also, *People v. Wein*, 50 Cal. 2d 383, 326 P. 2d 457, cert. den. 358 U. S. 866, 3 L. Ed. 2d 99, 79 S. Ct. 98, reh. den. 358 U. S. 896, 3 L. Ed. 2d 122, 79 S. Ct.

153 (any distance sufficient); *People v. Loignon,* 160 Cal. App. 2d 412, 325 P. 2d 541 (opening door of automobile and pulling child into car); *People v. Oganesoff,* 81 Cal. App. 2d 709, 184 P. 2d 953 (forcibly carrying victim from automobile into defendant's house)." (pp. 471-72.)

In *Ayers* we recognized the *Brown* decision as relying in part on *People v. Florio,* 301 N. Y. 46, 92 N. E. 2d 881 (1950), which had upheld convictions for both kidnapping and rape where a girl was enticed into an automobile and driven to an isolated spot where she was raped. By the time *Ayers* was decided (1967), *People v. Florio* had been overruled by *People v. Levy,* 15 N. Y. 2d 159, 204 N. E. 2d 842 (1965). *Levy* construed the New York kidnapping statute as to not cover a situation where two victims were held at gunpoint in their car and driven around New York City some 27 city blocks and for 20 minutes, while being relieved of their money and valuables. The gist of the crime committed, the New York court said, was robbery. The statute (N. Y. Penal Law § 1250) provided that one who "confines" another with intent to "cause him . . . to be confined" against his will was guilty of kidnapping. The court said:

"This definition could literally overrun several other crimes, notably robbery and rape, and in some circumstances assault, since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes. Some of the definitions could apply alike to kidnapping and abduction. It is a common occurrence in robbery, for example, that the victim be confined briefly at gunpoint or bound and detained, or moved into and left in another room or place.

"It is unlikely that these restraints, sometimes accompanied by asportation, which are incidents to other crimes and have long been treated as integral parts of other crimes, were intended by the Legislature in framing its broad definition of kidnapping to constitute a separate crime of kidnapping, even though kidnapping might sometimes be spelled out literally from the statutory words." (*Id.,* 15 N. Y. 2d at 164.)

The *Levy* rationale was presented to this court in *Ayers,* and we concluded:

". . . We have carefully examined the majority opinion in *Levy.* The reasons stated therein for changing the previous New York interpretation are not of sufficient persuasion to cause us to reject our construction of our statute announced ten years ago in *Brown* and consistently adhered to thereafter." (*State v. Ayers,* supra, 198 Kan. at 472.)

The defendants here ask us to re-examine the *Brown-Ayers* rule. We have done so, and remain convinced that those cases were correctly decided under our former law. We cannot but think that the victims in *Levy,* for example, were victims of a kidnapping as well

as a robbery. Defendants also ask us to consider developments in the law since those cases were decided. For example, in New York *Levy* was extended to cover a kidnap-rape situation in *People v. Lombardi,* 20 N. Y. 2d 266, 229 N. E. 2d 206 (1967). There the victims were drugged and driven across town to a motel where they were assaulted. The court held there was no kidnapping, saying:

". . . [T]he direction of the criminal law has been to limit the scope of the kidnapping statute, with its very substantially more severe penal consequences, to true kidnapping situations and not to apply it to crimes which are essentially robbery, rape or assault and in which some confinement or asportation occurs as a subsidiary incident." (*Id.,* 20 N. Y. 2d at 270.)

In California a similar movement was under way. *People v. Chessman,* 38 Cal. 2d 166, 238 P. 2d 1001, relied on by this court in *Brown,* and *People v. Wein,* 50 Cal. 2d 383, 326 P. 2d 457, relied on in *Ayers,* were both effectively overruled in *People v. Daniels,* 71 Cal. 2d 1119, 80 Cal. Rptr. 897, 459 P. 2d 225. Among the charges against the defendants in *Daniels* were three counts of kidnapping for the purpose of robbery, with harm to the victim. The crimes charged were similar to our present crime of aggravated kidnapping. In each instance the victim was met at the front door of her house or apartment by a man with a gun demanding money. Each was forced to move some distance through her residence, and each was raped. The court concluded that the California kidnapping statute was not intended to cover movement or detention of the victim which was merely a subsidiary incident of a robbery, assault or rape. It formulated a new California rule:

"For the reasons stated, the rule of construction declared in *People v. Chessman* (1951) *supra,* 38 Cal. 2d 166, 192, i. e., that 'It is the fact, not the distance, of forcible removal which constitutes kidnaping in this state,' is no longer to be followed. Rather, we hold that the intent of the Legislature . . . was to exclude from its reach not only 'stand-still' robberies . . . but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Id.,* 71 Cal. 2d at 1139.)

In *Daniels* the California court relied on *Levi* and *Lombardi,* and also on the American Law Institute's comments to the kidnapping section of the Model Penal Code:

"The learned draftsmen of the Model Code explain that 'it is desirable to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, because the broad scope of this overlapping offense has given rise to serious injustice, as well as to

distortion of criminal statistics. Examples of abusive prosecution for kidnapping are common. Among the worst is use of this means to secure a death sentence or life imprisonment for behavior that amounts in substance to robbery or rape, in a jurisdiction where these offenses are not subject to such penalties. . . . The criminologically nonsignificant circumstance that the victim was detained or moved *incident to* the crime determines whether the offender lives or dies.' (Italics added.) (Comments to § 212.1 (Tent. Draft No. 11, 1960), pp. 13-14.)" (*People v. Daniels,* supra, 71 Cal. 2d at 1138.)

Michigan, also, was faced with the lack of an asportation requirement in a statute similar to our former K. S. A. 21-449 in *People v. Adams,* 389 Mich. 222, 205 N. W. 2d 415 (1973). In that case three inmates of the state prison, including the defendant Adams, seized several prison guards and officials and forced them at knifepoint to move from one part of the prison to another. After several hours of negotiations over prison conditions all of the captives were released unharmed. Adams was convicted of kidnapping.

The Michigan court reviewed the New York swing from *Florio* to the *Levy-Lombardi* rule, and the California abandonment of *Chessman-Wein* for *Daniels.* It rejected as a controlling element the *Daniels* requirement that the movement must "substantially increase the risk of harm," but retained that as one element to be considered. It found "the critical and significant criterion" was the one common to both New York and California, *i. e.,* that "[t]he movement element must not be 'merely incidental' to the commission of another underlying lesser crime." (*Id.,* 389 Mich. at 235.) The "Michigan Asportation Standard" formulated by the court, so far as relevant here, contains the following:

"The movement element is not sufficient if it is 'merely incidental' to the commission of another underlying lesser crime."

"If the movement adds either a greater danger or threat thereof, that is a factor in considering whether the movement adequately constitutes the necessary legal asportation, but there could be asportation without this element of additional danger so long as the movement was incidental to a kidnapping and not a lesser crime."

"Where appropriate, secret confinement or some other non-movement factor may supply a necessary alternative to asportation to complete statutory kidnapping."

"Whether or not a particular movement constitutes statutory asportation or whether there is an appropriate alternative element must be determined from all the circumstances under the standards set out above and is a question of fact for the jury." (*Id.,* 389 Mich. at 238.)

The New York, California and Michigan cases discussed above all dealt with statutes which, like our former K. S. A. 21-449, spoke variously in terms of "kidnapping," "seizing," "confining," "taking"

and the like. Were our former statute still on the books we might find such cases more persuasive than we do. They are not without force, as will be seen, but we must determine the meaning of the present Kansas kidnapping statute in the light of its own wording and its own legislative history.

Our present statute, K. S. A. 21-3420, became effective July 1, 1970, as part of a complete revision of our criminal code proposed by the Judicial Council. It provides:

"Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:

"(a) For ransom, or as a shield or hostage; or

"(b) To facilitate flight or the commission of any crime; or

"(c) To inflict bodily injury or to terrorize the victim or another; or

"(d) To interfere with the performance of any governmental or political function."

The Judicial Council notes indicate that it combines elements of the Model Penal Code, § 212.1, the New Mexico Criminal Code, § 40A-4-1, and former K. S. A. 21-449. A comparison of our statute with its sources indicates that subsections (a) through (d) defining the required specific intent are substantially the same as the corresponding subsections of Model Penal Code § 212.1. That section provides in pertinent part:

"A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following purposes:

"(a) to hold for ransom or reward for release, or as shield or hostage; or

"(b) to facilitate commission of any felony or flight thereafter; or

"(c) to commit bodily injury or to terrorize the victim or another; or

"(d) to interfere with the performance of any governmental or political function."

Further comparison readily shows, however, that the portion of our statute dealing with the proscribed physical conduct of the kidnapper differs markedly from the corresponding portion of the Model Penal Code. The Model Code requires removal of the victim "from his place of residence or business, or a substantial distance;" the Kansas statute merely requires a "taking." The Model Code requires that confinement be "for a substantial period in a place of isolation;" the Kansas statute merely requires a "confining." It is the unembellished "taking" and "confining" language that was borrowed from New Mexico.

The Model Penal Code's language is clearly designed to imple-

ment the rationale adopted in New York and California, and, of course, the A. L. I. comment quoted with approval in *Daniels,* supra. The drafters of our statute, however, specifically considered this language and rejected it in favor of the unqualified "taking or confining." We can only construe this bit of legislative draftsmanship as rejecting not only the language of the Model Penal Code, but at least to some extent the rationale underlying it.

We therefore construe our statute as requiring no particular distance of removal, nor any particular time or place of confinement. Under our present statute it is still the fact, not the distance, of a taking (or the fact, not the time or place, of confinement) that supplies a necessary element of kidnapping.

Such a construction, however, cannot be entirely unqualified. Our statute requires that the taking or confinement be accomplished not only by the proscribed means (*i. e.,* "by force, threat or deception") but also with the specific intent to accomplish one of four types of objectives. The first, to hold the victim for ransom or as a shield or hostage, gives no concern to us or to any other court. The cases discussed above all recognize, either explicitly or implicitly, that a taking for these purposes is a "classic" or "pure" form of kidnapping. Further, the confinement of the victim for these purposes supplies "a necessary alternative to asportation" (*People v. Adams,* supra) in the same way that the commission of a felony supplies a necessary alternative to premeditation in a first degree murder charge.

We are concerned here with the second type of intent, *i. e.,* to hold the victim "(*b*) to facilitate . . . the commission of any crime." It is when this purpose is present that the New York, California and Michigan courts have problems. Their rationale is that if the only purpose and result of the taking is to facilitate a lesser crime, the taking is by definition "merely incidental" to the lesser crime and the kidnapping statute was therefore not intended to cover it. We cannot adopt that rationale without ignoring the rather plain language of subsection (*b*). Under our statute a taking is a kidnapping if its purpose *is* to "facilitate" the commission of any crime, even if the crime facilitated be a less serious crime such as robbery or rape.

That does not end the inquiry, however. The key word, as we see it, is "facilitate." Webster defines it as "to make easier or less difficult: free from difficulty or impediment." (Webster's Third New International Dictionary.) See also, the Oxford English Dic-

tionary: "To render easier the performance of (an action), the attainment of (a result)." To be kidnapping, therefore, the taking need not be *necessary* to the accomplishment of the underlying crime, but it must be aimed at making it at least "easier."

Further, to "facilitate" in our minds means something more than just to make more convenient. We think that a taking or confining, in order to be said to "facilitate" a crime, must have some significant bearing on making the commission of the crime "easier" as, for example, by lessening the risk of detection.

It is at this point we believe the New York, California and Michigan decisions have persuasive force. We agree with those courts that a kidnapping statute is not reasonably intended to cover movements and confinements which are slight and "merely incidental" to the commission of an underlying lesser crime. Thus the "standstill" robbery and the ordinary rape require as a necessary incident some "confinement" of the victim—they are nevertheless not kidnappings solely for that reason. In the light of our statute, however, we cannot agree that merely because a taking "facilitates" another crime it must necessarily be "merely incidental" to the other crime. Whether a taking substantially "facilitates" another crime or whether it is "merely incidental" are two different things. The same taking cannot be both.

Even the California cases following *Daniels* recognize that movement of minor geographical significance may constitute a kidnapping, if it "facilitates" another crime in some substantial way, and is not merely a subsidiary incident to such other crime. Lessening the risk of detection is the prime example of such "facilitation." See *e. g., People v. Thomas*, 3 Cal. App. 3d 859, 83 Cal. Rptr. 879, where two girls were accosted in a well-lighted street, forced at gunpoint into an alley and robbed; *People v. Miller*, 12 Cal. App. 3d 922, 91 Cal. Rptr. 97, where the victims were transported from a busy street corner to a secluded residential area where they were robbed and raped; *People v. Ellis*, 15 Cal. App. 3d 66, 92 Cal. Rptr. 907, where the victims were accosted outside their apartment buildings, forced to enter their apartments, and there robbed; *People v. Hill*, 20 Cal. App. 3d 1049, 98 Cal. Rptr. 214, where a couple was accosted in a parking lot and forced to enter a supermarket for the purpose of robbery; and *People v. Curtis*, 21 Cal. App. 3d 704, 98 Cal. Rptr. 775, where the victims were seized in their car at a well-lighted intersection, forced to drive some five blocks to a dark, deserted spot under a freeway, and there robbed. In each of these

cases it was held that a kidnapping occurred, even though in each case the ultimate aim of the defendant was some lesser crime. The kidnapping not only increased the risk of harm to the victim but it "facilitated" the commission of another crime by substantially reducing the risk of detection.

Like the Michigan court we reject the *Daniels* rule that where the purpose of the kidnapping is to facilitate another crime an increased risk of harm to the victim is an indispensable element. Such an increased risk will frequently be present, but it is not essential.

We therefore hold that if a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

(*a*) Must not be slight, inconsequential and merely incidental to the other crime;

(*b*) Must not be of the kind inherent in the nature of the other crime; and

(*c*) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

For example: A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is. The forced direction of a store clerk to cross the store to open a cash register is not a kidnapping; locking him in a cooler to facilitate escape is. The list is not meant to be exhaustive, and may be subject to some qualification when actual cases arise; it nevertheless is illustrative of our holding.

Applying the principles above to our present case, we hold that the conduct of the defendants constituted kidnapping under our statute. The Penners were accosted outside the Dairy Queen, at the fringe of the parking lot, where they were subject to public view. Mrs. Penner had the day's receipts with her, and the robbery could have been accomplished then and there. If the money was inside, the defendants could have gone in after it without taking the Penners with them. Instead, the defendants forced the Penners to return to the relative seclusion of the inside of the store. That movement, slight though it was, substantially reduced the risk of detection not only of the robbery but of the rape. Except in the matter of distance, which we are holding to be irrelevant, it was as

if the defendants had seized the Penners at home and forced them to return to the store before the robbery and rape. There was, in our view, a taking and confinement to "facilitate" the commission of the robbery and rape.

One final point requires mention; Perry suggests that the court should have instructed on unlawful restraint. His testimony, as previously noted, was that he went to the Dairy Queen with intent to rob. Hence, by his own testimony, his taking and confining of Larry Penner was with the requisite specific intent. There was no evidence to justify an instruction on the lesser offense. *State v. Masqua,* supra. Cf. *State v. Ponds and Garrett,* 218 Kan. 416, 543 P. 2d 967, Syl. ¶ 9.

The convictions are affirmed.

APPROVED BY THE COURT.