NOT DESIGNATED FOR PUBLICATION

No. 123,274

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER DEAN GUSTIN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Shawnee District Court; C. WILLIAM OSSMANN, judge. Opinion filed March 18, 2022. Affirmed.

*Christopher M. Joseph* and *Carrie E. Parker*, of Joseph, Hollander & Craft LLC, of Topeka, for appellant.

*Kurtis Wiard*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., MALONE, J., and RICHARD B. WALKER, S.J.


PER CURIAM: Christopher Gustin beat, stabbed, restrained, and choked Audrey Gustin, his now ex-wife, at his apartment a week before their divorce became final. Their two children were in the apartment while this happened. Audrey survived and escaped the apartment, eventually calling law enforcement for help. At the end of his trial, a jury convicted Christopher of one count of attempted murder, one count of aggravated kidnapping, and two counts of aggravated child endangerment. Christopher concedes he is guilty of attempted murder and both counts of child endangerment, but he argues there was insufficient evidence to convict him of aggravated kidnapping. After a careful review

1

of the record, we find the State presented sufficient evidence to support his conviction for aggravated kidnapping and therefore affirm his conviction for that offense.

FACTS

Because the issues raised by Gustin on appeal deal with the sufficiency of the evidence presented to the jury, his contentions are highly fact sensitive. Thus, it will be necessary to recount those facts presented to the jury in considerable detail.

Audrey and Christopher Gustin were married in May 2013 and had two children during their marriage. E.G., their daughter, had been born in 2015, and J.G, their son, had been born in 2017. In June 2018, Audrey filed for divorce.

After doing so, Audrey continued to reside at the marital home, while Christopher moved to his mother's home for a couple of weeks before moving to an apartment complex. Audrey said the two did not amicably split; they often argued and had custody issues with their children. At the time of the events in this case, a court-ordered mediator had scheduled parenting time with each parent. Under this arrangement, Christopher could pick up the children for two or three days per week, and Audrey would pick them up from his apartment after visitation. But Christopher did not have a vehicle at the time, which prevented him from seeing the children. Between June 2018 and May 2019, Audrey said Christopher missed many visits. Christopher said Audrey made it difficult for him to see the children.

In April 2019, Audrey recalled getting an unexpected piece of mail notifying her that the address for her vehicle registration had been changed to Christopher's apartment address. On May 30, 2019, Christopher texted Audrey and told her he received her vehicle registration tags and had money for her. In exchange for these things, Christopher requested that Audrey bring their children to his apartment for a few minutes. Audrey

2

later responded, telling Christopher that he could pick up their children the next day and bring the registration when he did. The two exchanged a few more messages, in which Christopher continued to ask Audrey to bring the kids to his apartment, and Audrey expressed reticence to do so. Ultimately, Audrey told Christopher she would contact him the next day.

The following day Audrey texted Christopher at about 11:15 a.m., asking him whether he was home. He answered her text about three hours later, but Audrey did not respond. Just before 4 p.m. Christopher again asked Audrey to bring the children to his apartment for a few minutes. Around 4:30 p.m., Audrey told Christopher they were on the way, and at about 4:45 she let him know they were almost there. When they arrived, Audrey called Christopher three times, but he never answered. She then walked to his apartment door and began knocking. At about 4:51 p.m., Christopher sent Audrey an obscenity-laden text message telling her to go away.

Less than a minute later, E.G. began yelling for her father to open his door, which he did. E.G. proceeded inside and hugged Christopher, while Audrey and J.G. stayed near the door. Audrey stood in the doorway with J.G. for about five minutes before telling the children they needed to leave. Christopher and Audrey's testimony conflicted as to how E.G. responded. According to Audrey, Christopher told her she could not leave and took E.G. into the back corner of the kitchen, where she started crying and saying she wanted to leave with Audrey. According to Christopher, he asked Audrey to wait a couple of more minutes, but she refused. As she entered the apartment, Christopher told her to leave because he did not give her permission to enter.

Both agreed that Audrey entered Christopher's apartment and proceeded toward E.G. in the kitchen. Audrey said that E.G. reached for her, and she eventually picked up both children in her arms without a struggle. Christopher said that both parents started

3

tugging E.G. back and forth for about 10 to 20 seconds before Christopher let go. Both also agreed that after Christopher let E.G. go, Christopher turned violent.

Audrey said that as she turned to leave Christopher's apartment, he grabbed her by the back of her hair and hit her head against the refrigerator 10 to 15 times. After doing that, he started punching or headbutting her, before ultimately putting her in a chokehold. She then fell to her knees, but Christopher continued to headbutt or punch her. While on the ground, Audrey maintained hold of the children, but Christopher continued to hit and choke her. Eventually, she ended up on her back, at which point Christopher began to choke her.

According to Christopher, he began by punching Audrey in the head 5 to 10 times, in his estimation. Both children began crying. Audrey had picked up E.G. and tried to pick J.G. up next. While doing so, Christopher continued to hit her on the head and told her to let the children go. After suffering multiple punches to her head, Audrey fell to her knees. Christopher said he punched her on the head 5 to 10 more times after she picked up J.G., but she kept hold of the children.

At some point, Christopher stopped choking Audrey while she lay on her back and left to grab something from a different room. Audrey, thinking she had a chance to flee the apartment, got up and staggered towards the door. Before she could open the door, Christopher pulled her back into the apartment and began stabbing her with a knife. Audrey said Christopher stabbed her first in the right side of the neck. Then, he stabbed her on the right side of the front of her neck and the left side of her neck. After the third stab, Audrey moved the children to her left arm, trying to maintain her hold on them. Christopher then stabbed her right hand multiple times. In total, Audrey said Christopher stabbed her hand eight times. Christopher's testimony did not largely differ from Audrey's about this portion of events, though he said he only stabbed her two or three times in her neck and hand. He believed the other testimony overstated the number of stab wounds

4

Audrey suffered, though he acknowledged she did not have any injuries before coming inside his apartment.

After being stabbed multiple times, Audrey said Christopher started choking her again, cutting off her breathing. At this point, the stab wounds to her right hand rendered it unusable, so she had to let go of the children to use her left hand to fight for oxygen. Audrey said Christopher continued to choke her, but her neck bled profusely, making it difficult for him to maintain his grip. Both children, who were observing what happened, began crying, and J.G. tried to pull Christopher off Audrey, to no avail. Christopher then told both children to go to the bathroom. At that point, Christopher straddled Audrey, pinning both her arms above her head. Audrey said this continued for about 30 minutes. When she remained quiet, Christopher simply held her down. But when she screamed for assistance or tried to get him off, he would either choke her or put his hand over her mouth and nose and smother her.

Christopher's version differed. He said he dropped the knife after Audrey let the children go. Then, he picked up the children to take them to their room. He then claimed Audrey came up behind him and cut him in the arm with the knife. To prevent her from cutting him again, Christopher grabbed both of her wrists and wrestled Audrey to the ground. Christopher ended up on top of her, holding her wrists above her head. He told her to drop the knife multiple times, but she refused. About five minutes later, she relinquished her hold on the knife. Christopher then grabbed the knife and threw it into the living room.

While Audrey remained on the ground, she said she did the following:

"I said a hundred different things, a hundred different times. I started with, 'Call 911.' And I would just--I repeated it over and over and over. And he did not respond to that. Or if he did he would just say, 'No. I'm not going to call. You're going to die here.'

5

He's like, 'I'm just waiting for you to bleed out.' And he just kept saying, 'No. You're going to die here.'

"And so then I was like, 'Well [J.G.] is crying. Go check on [J.G.]. Just go check on him.' Because [J.G.] was crying so hard he could hardly breath[e]. So I just kept telling him to go check on him. I probably said that a hundred times. And that didn't work either.

"And so I asked him, I was like, you know, 'Why are you doing this. What did you think would happen if you did this?' And he said, 'Well, you took everything from me.'

"And so--and then I was like, 'Well, what do you think is going to happen?' He was like, 'I don't care. We're both going to die today.'

And so I just kept trying to repeat myself. And finally I told him, you know, 'Just leave me. Just leave me here to die. And take my phone, and my car, and money. And I'll die before anybody ever gets here.'"

Audrey also said she feigned death at one point, but it did not convince Christopher. Eventually, she told him her keys were in her vehicle and he should take it. She also told Christopher he could take her money, as well as her phone to prevent her from calling for help. Christopher eventually relented and allowed her to get up from the floor. He then placed a coat over her and zipped it all the way up to cover the blood. When Christopher went to change his shirt, Audrey asked if he could put J.G.'s boots on for him because she knew the boots were near her phone. Before he turned around, she called 911 and put the phone in her pocket.

Christopher did not notice that Audrey had called 911 until he heard the dispatcher on the phone. By that time, Audrey had gathered the children and went to open the apartment door. When she opened it, Christopher ran past her and went to her vehicle because she had told him her keys were inside. When Audrey saw Christopher get inside the driver's side door of her vehicle, she began knocking on other apartment doors to try to get help. She also remembered she had 911 dispatch still on the phone, so she began speaking with the dispatcher. Eventually, she saw two individuals in the parking lot and

asked for their help. A few minutes later, law enforcement arrived at Christopher's apartment complex. At that point, Christopher returned to his apartment.

Officer Brady Qualls of the Topeka Police Department received a call about the stabbing at about 5:26 p.m. He arrived at Christopher's apartment complex about five minutes later, where he saw Audrey covered in blood and walking away from the apartment carrying her two children. After first assisting Audrey, he began working with other officers to remove Christopher from his apartment. Body camera footage captured Qualls' initial interaction with Audrey, which the State showed to the jury.

Kevin Schulz, another Topeka police officer, responded to Christopher's apartment at about 5:34 p.m. Upon arrival, he took charge of the tactical response team, which oversaw the evacuation of the other apartment dwellers and removal of Christopher from his apartment. Roughly two hours after Officer Schulz arrived, Christopher surrendered and Schulz took him into custody.

Schulz then performed a protective sweep of the apartment. He found no one else inside Christopher's apartment, but he did find evidence of a violent struggle. He remembered seeing blood throughout most of the rooms. He also found a green knife covered in blood on the kitchen counter. Matthew Ford, a crime scene investigator with the Topeka Police Department, photographed Christopher's apartment. The photographs depicted the various rooms inside covered in blood, as well as the green knife Officer Schulz testified about and the inside of Audrey's vehicle.

At the end of trial, the jury convicted Christopher of attempted murder in the first degree, aggravated kidnapping, and two counts of child endangerment. At sentencing, the district court sentenced Christopher to 155 months' imprisonment for attempted murder in the first degree, 147 months' imprisonment for aggravated kidnapping, and 6 months'

imprisonment on each count of aggravated child endangerment. The sentences ran consecutively, resulting in a total controlling sentence of 314 months' imprisonment.

Christopher has timely appealed.

ANALYSIS

As his single issue on appeal, Christopher challenges the sufficiency of the evidence regarding his conviction for aggravated kidnapping. He asserts the State failed to provide sufficient evidence to prove him guilty under each alternative means of the aggravated kidnapping statute. Christopher does not challenge his convictions for attempted murder or aggravated child endangerment.

Our Supreme Court has provided direction for how we must consider offenses that arise from alternate means:

"We have previously explained that when a single offense may be committed in more than one way, the jury must be unanimous as to the defendant's guilt. But unanimity is not required as to any individual means so long as substantial evidence supports each means. Alternative means issues arise when the statute and any instructions that incorporate it list distinct alternatives for a material element of the crime. 'Consequently, determining whether a case involves alternative means is typically a matter of statutory construction, which is a question subject to unlimited review.' [Citations omitted.]" *State v. Sasser*, 305 Kan. 1231, 1239, 391 P.3d 698 (2017).

Before delving into Christopher's arguments, it useful to revisit the history of the kidnapping statute over the last decade. In *State v. Haberlein*, 296 Kan. 195, 290 P.3d 640 (2012), our Supreme Court considered various provisions of the kidnapping statute in the context of alternative means. Haberlein had been convicted of one count of aggravated kidnapping under K.S.A. 21-3421, the previous version of the statute, which

8

provided: "'Aggravated kidnapping is kidnapping, as defined in K.S.A. 21-3420 and amendments thereto, when bodily harm is inflicted upon the person kidnapped.'" 296 Kan. at 202.

The version of the kidnapping statute, K.S.A. 2018 Supp. 21-5408, the law which was in effect at the time of the events in this case, states:

"(a) Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:
          "(1) For ransom, or as a shield or hostage;
          "(2) to facilitate flight or the commission of any crime;
          "(3) to inflict bodily injury or to terrorize the victim or another; or
          "(4) to interfere with the performance of any governmental or political function.
"(b) Aggravated kidnapping is kidnapping, as defined in subsection (a), when bodily harm is inflicted upon the person kidnapped."

The previous version of the kidnapping statute, K.S.A. 21-3420, which was the pertinent statute considered in *Haberlein,* contained nearly identical language. The main difference with the current version of the statute is simply an organizational change: an amended version effective July 1, 2011, placed both kidnapping and aggravated kidnapping in a single statute. See K.S.A. 2020 Supp. 21-5408; *Haberlein*, 296 Kan. at 202. For this reason, *Haberlein* remains pertinent to the issues before us.

In *Haberlein*, our Supreme Court concluded that "[f]orce, threat, and deception are not alternative means of committing a kidnapping or aggravated kidnapping." 296 Kan. at 208. The high court also held that each subsection of the statute "states an additional and distinct way of committing the crime, and proof of one of these additional and distinct material elements must be shown in order to support a conviction. Thus, the different subsections create alternative means of committing a kidnapping." 296 Kan. at 209. But our Supreme Court held that "[f]acilitation of flight and facilitation of the commission of

9

a crime are mere options within a means." 296 Kan. at 209. Put differently, the language of what is now K.S.A. 2020 Supp. 21-5408(a)(2) does not create alternative means of committing kidnapping. See 296 Kan. at 209.

During Christopher's trial, the district court gave the following aggravated kidnapping instruction:

> "The defendant is charged in Count 2 with the crime of aggravated kidnapping. The defendant pleads not guilty.
> "To establish this charge, each of the following claims must be proved:
> "1.      The defendant took or confined Audrey Marie Gustin by force or threat.
> "2.      The defendant did so with the intent to hold Audrey Marie Gustin: to facilitate flight or the commission of any crime or to inflict bodily injury on or to terrorize Audrey Marie Gustin.
> "3.      Bodily harm was inflicted upon Audrey Marie Gustin.
> "4.      This act occurred on or about the 31st day of May, 2019, in Shawnee County, Kansas.
> "The State must prove that the defendant committed the offense of aggravated kidnapping intentionally. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about, or cause the result complained about, by the State."

Christopher argues the "taking or confining" language of K.S.A. 2018 Supp. 21-5408(a) are alternative means by which kidnapping can be committed. To support his argument, Christopher points to language in *Haberlein*, where our Supreme Court stated: "Haberlein does not challenge the phrase 'taking or confining' in this appeal. Those two terms set out two alternative means of carrying out the crime of kidnapping and thus aggravated kidnapping. 'Taking' and 'confining' each denotes a distinct *actus reus* and they are, therefore, alternative means." 296 Kan. at 208.

The State challenges this conclusion, arguing the language from *Haberlein* finding "taking" and "confining" to be alternate means is dicta, and therefore not binding on us in this case. It is a well-settled principle that this court is duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Kansas Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). But the State is correct that dicta is not binding on a court. See *Law v. Law Co. Building Assocs.*, 295 Kan. 551, Syl. ¶ 1, 289 P.3d 1066 (2012) ("Dicta in a court opinion is not binding, even on the court itself, because the court should consider the issue in light of the briefs and arguments of counsel when the question is squarely presented for decision."); *State v. Lowery*, 308 Kan. 359, 371, 420 P.3d 456 (2018) (Johnson, J., concurring) (citing *Law* for the same proposition).

The implication from this portion of the parties' arguments is clear. If the "taking or confining" language of K.S.A. 2018 Supp. 21-5408(a) are alternative means by which kidnapping can be committed, then "sufficient evidence must support each of the alternative means charged to ensure that the verdict is unanimous as to guilt." *State v. Butler*, 307 Kan. 831, 841, 416 P.3d 116 (2018). Put another way, if these are alternate means of committing kidnapping, sufficient evidence must support that Christopher both took and confined Audrey in order for him to be convicted of aggravated kidnapping. See K.S.A. 2018 Supp. 21-5408(a).

We recognize that other panels of our court have held that the language from *Haberlein* commenting that "taking or confining" are alternate means of committing kidnapping is mere dicta. In *State v. Lloyd,* No. 113,486, 2016 WL 6568746, at *7-9 (Kan. App. 2016) (unpublished opinion) (Malone, C.J., concurring), *rev. denied* 306 Kan. 1326 (2017), and again in *State v. Ross,* No. 118,199, 2019 WL 847672, at *22 (Kan. App. 2019) (unpublished opinion), the respective panels concluded that, contrary to the dicta in *Haberlein,* "taking or confining" are not alternate means of committing

kidnapping under the language of K.S.A. 2018 Supp. 21-5408(a), and thus the Supreme Court was wrong.

However, in resolving the issues raised by Christopher in this case we find it unnecessary to wade into the dicta issue in the same manner as *Lloyd* and *Ross.* For purposes of our decision we will simply assume, *arguendo,* that our Supreme Court was correct in opining that taking and confining are, in fact, alternate means. Without either approving or rejecting the holdings of *Lloyd* and *Ross,* we will simply start by applying the more rigorous standards of the *Haberlein* dicta. In other words, as the holding in *Butler* requires, for Christopher's aggravated kidnapping conviction to stand, we must find that the State has presented sufficient evidence of *both* taking *and* confining Audrey by Christopher. And as we detail below, after a careful review of the record we find that the State has met its burden of proving that Audrey was both taken and confined by Christopher.

In order to more logically address these separate points, we have reordered the sequence of Christopher's contentions set out in his brief.

*Sufficient Evidence Proved a Taking Occurred*

For his first challenge to the sufficiency of the evidence, Christopher argues the evidence was insufficient to prove a taking occurred.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

Both parties agree that the term "take" is not defined by the Kansas Criminal Code. Christopher argues that "appellate courts affirm kidnapping convictions on the theory that a taking has occurred when evidence shows a victim was moved from one place to another." Similarly, he argues that previous cases from our Supreme Court use "the term 'taking' interchangeably with 'movement.'" The State disagrees, arguing we should use the "Webster's Universal College Dictionary 803 (1997)" definition, which states that "'take' is broadly defined as 'to seize or capture;' . . . 'to catch or get;' 'to hold, grasp, or grip;' 'to remove;' and 'to get into one's possession or control by force.'"

Black's Law Dictionary has four definitions for the word "take":  1) "[t]o obtain possession or control, whether legally or illegally"; 2) "[t]o seize with authority; to confiscate or apprehend"; 3) "[t]o acquire (property) for public use by eminent domain; (of a governmental entity) to seize or condemn property"; and 4) "[t]o acquire possession by virtue of a grant of title, the use of eminent domain, or other legal means; esp., to receive property by will or intestate succession." Black's Law Dictionary, 1754 (11th ed. 2019).

Advancing his argument, Christopher contends he never moved or removed Audrey from one place to another. He points out that she entered his apartment under her own volition, and, once inside, he never took or moved her "anywhere else - not outside the apartment, not even from one room to another within the apartment."

But in *State v. Buggs*, 219 Kan. 203, 214, 547 P.2d 720 (1976), the Kansas Supreme Court stated it is "the fact, not the distance, of a taking (or the fact, not the time or place, of confinement) that supplies a necessary element of kidnapping." Our Supreme Court later reaffirmed this rule from *Buggs* in *State v. Burden*, 275 Kan. 934, 943, 69 P.3d 1120 (2003), stating that the kidnapping statute "requires no particular distance of removal, nor any particular time or place of confinement."

13

A panel of our court also discussed what constitutes a taking in *State v. McCoy*, No. 110,827, 2015 WL 3632037 (Kan. App. 2015) (unpublished opinion), *rev. denied* 304 Kan. 1020 (2016). There, McCoy's sister and his child were in a hotel room with him when he called the mother of his child and told her to come to the hotel room to pick up the child. When the child's mother showed up, McCoy asked her to come inside. She refused, at which point McCoy grabbed her by the hair and told his sister to beat her up. Somehow, the mother got away, and her friend called the police. When the police arrived, a standoff ensued. Eventually, the police officers entered McCoy's hotel room by force. Inside, they saw McCoy sitting on a hotel bed holding his child in one arm, using the child to cover his face. McCoy used his other arm to hold his sister, and he had a gun in the hand wrapped around her. McCoy alternated pointing the gun at his sister and the police officers, before eventually losing control of the gun and being arrested. Following trial, a jury convicted him of kidnapping his sister, among other crimes.

On appeal, McCoy argued the evidence was insufficient to convict him of kidnapping. He "contend[ed] that he could not have taken his sister into the hotel room by force or threat because there was no evidence presented that she entered the hotel room involuntarily." 2015 WL 3632037, at *16. Our court rejected his argument. After citing the above-stated rule from *Burden*, the panel reasoned:

> "All the police officers who entered the hotel room testified that when they entered the hotel room, McCoy was physically holding [his sister] with his arm as he sat on the bed, using her body to shield himself. Those police officers additionally testified that McCoy pointed a gun at [his sister's] chest and under her chin during the standoff. As [the sister] was being held by McCoy, she yelled, 'Don't shoot.' Moreover, when [the sister] was leaving the room, she shouted that '[he] had a gun to my head' and that McCoy would not let her answer her cell phone or acknowledge the presence of the police outside the hotel room.

14

"Thus, while [the sister] voluntarily entered the room, at some point McCoy grabbed her, physically held on to her with his arm, and held a gun on her. Based on [the sister's] statements during the standoff and as she was exiting the hotel room, she was not voluntarily being held by McCoy. As a result, McCoy's argument that there was not sufficient evidence to support the alternative means of kidnapping by taking fails because his actions of physically holding onto [his sister] while pointing a gun at her constitutes a taking." 2015 WL 3632037, at *16-17.

Additionally, as our court noted in *Lloyd*, the *McCoy* panel found that "[c]onfining was implicit, though, because the defendant prevented the victim from leaving the room." 2016 WL 6568746, at *4.

The facts from *McCoy* are analogous to this case. Audrey entered Christopher's apartment voluntarily after he opened his door. She stood in the doorway for about five minutes before telling E.G. they needed to leave. She then entered the apartment to get E.G., and Christopher told her he would not allow her to leave. When she did try to leave, Christopher began either hitting her in the head or hitting her head against the refrigerator.

When he stopped hitting her momentarily to grab the knife, Audrey got to her feet and staggered towards the door to flee the apartment with her children. She reached the door but could not get it open in the few seconds she had. Then, Christopher pulled her back into the apartment and repeatedly stabbed her in the neck. Audrey also said that Christopher straddled her for nearly 30 minutes after stabbing her. In a video shown to the jury, Christopher admitted to tackling Audrey to the ground when she made a break for the door. He also threw her phone so she could not call for help.

Again, as our Supreme Court emphasized in *Burden*, the kidnapping statute "requires no particular distance of removal, nor any particular time or place of confinement. Under the kidnapping statute it is the fact, not the distance, of a taking (or

15

the fact, not the time or place, of confinement) that supplies a necessary element of kidnapping." 275 Kan. at 943.

Thus, even though Audrey entered the apartment voluntarily, she did not remain there voluntarily. Instead, Christopher physically restrained her movements when she tried to leave, going so far as to stab her and tackle her when she tried to open the door. According to Audrey, Christopher pinned her to the ground for a long time after he stabbed her. Viewing these actions in the light most favorable to the State, these actions could allow a rational factfinder to conclude Christopher's actions constituted a taking. See *Chandler*, 307 Kan. at 668.

*Sufficient Evidence Proved that Christopher Confined Audrey*

Christopher also vigorously argues that we should reverse his conviction for aggravated kidnapping because the evidence was insufficient to prove he confined Audrey.

The standard of review stated above regarding the sufficiency of the evidence applies again here. See *Chandler*, 307 Kan. at 668. To the extent we must interpret the kidnapping statute, we exercise de novo review. See *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019).

Specifically, Christopher argues:

> "A ruling on this issue requires this Court to determine what it means to 'confine' someone, as that term is used in K.S.A. 21-5408. For the reasons set out below, this Court should find the confinement prohibited by the kidnapping statute requires more than the restriction of liberty prohibited by the criminal restraint statute. And, consistent with Kansas Supreme Court precedent, it should find that it requires more than the physical restraint subsumed in a murder, robbery, sexual battery, or other crime involving an

assault on another person--regardless of whether the purpose of the confinement was 'to facilitate flight or the commission of any crime' or 'to inflict bodily injury or to terrorize the victim or another.'"

But, as the State points out, Christopher's argument "is, in essence, that the underlying rationale in *Buggs* should apply to the alternative means of 'inflict bodily injury or to terrorize the victim or another.'"

And our Supreme Court rejected a similar line of argument in *Burden*, stating:

"The three-pronged *Buggs* test is applicable in determining whether the taking or confining was done with the intent to facilitate flight or the commission of another crime as set forth in subsection (b) [now codified at K.S.A. 2020 Supp. 21-5408(a)(2)]. There is nothing in *Buggs* that would indicate these three restrictions were intended to apply to any taking or confining charged under any subsection other than (b). In fact, the language in *Buggs* is to the contrary. There is no underlying crime intended to be facilitated under (c) [now codified at K.S.A. 2020 Supp. 21-5408(a)(3)]; the taking or confining is done with the intent to inflict bodily injury upon or to terrorize the victim or another; facilitation is irrelevant herein." 275 Kan. at 943-44.

And as stated above, we are duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Kansas Supreme Court is departing from its previous position. *Rodriguez*, 305 Kan. at 1144. Instead of arguing our Supreme Court is departing from this position, Christopher argues his position is consistent with the rule.

In *Lloyd*, our court noted the lack of statutory definition for the words "confine" and "confinement." 2016 WL 6568746, at *3. The panel then noted that "[t]he absence of a statutory definition causes us to believe that a jury would be expected to use a nontechnical definition of the word confine which is rooted in common parlance and usage." 2016 WL 6568746, at *4. They then used the definition of confine from

17

Webster's II New College Dictionary 236 (1995), which defined it as "'[t]o keep within bounds . . . [t]o keep shut up'; and most pertinently for our understanding as '[t]o restrain in movement.'" 2016 WL 6568746, at *4. Currently, Black's Law Dictionary defines confinement as: "The act of imprisoning or restraining someone; the quality, state, or condition of being imprisoned or restrained." Black's Law Dictionary 373(11th ed. 2019).

Under these definitions, we believe Christopher's actions constituted a confinement of Audrey. In *State v. Snyder*, No. 119,452, 2020 WL 6372259, at *11 (Kan. App. 2020) (unpublished opinion), our court reversed the defendant's conviction for kidnapping, reasoning there was insufficient evidence of "taking or confining" because "Snyder's act of grabbing K.B.'s arm as she tried to escape the bathroom and dragging her back inside was 'slight, inconsequential, and merely incidental to' his committing aggravated indecent liberties with a child." For the reasons we set out in the previous discussion related to "taking," Christopher's confinement of Audrey was not "slight, inconsequential, and merely incidental to" the attempted murder. See *Buggs*, 219 Kan. at 216.

Instead, Christopher confined Audrey for a long time after he beat and stabbed her by straddling her. He also threw her phone so she could not alert assistance of any kind. Such conduct was not subsumed within the crime of attempted murder because Christopher had already inflicted the damage. Clearly, Christopher restrained Audrey's movements. And as our court noted in *Lloyd*, the *McCoy* panel found that "[c]onfining was implicit, though, because the defendant prevented the victim from leaving the room." 2016 WL 6568746, at *4.

In sum, viewing Christopher's actions in the light most favorable to the State, a rational factfinder could conclude Christopher confined Audrey under the kidnapping statute. See K.S.A. 2018 Supp. 21-5408(a); see *Chandler*, 307 Kan. at 668.

18

*The State's Evidence Proved the Taking and Confining of Audrey Was for Facilitation of Flight or the Commission of Any Crime*

Christopher's remaining argument is that "[t]he trial evidence was insufficient to show facilitation of flight or the commission of any crime."

To reiterate, the district court gave the following aggravated kidnapping instruction:

> "The defendant is charged in Count 2 with the crime of aggravated kidnapping. The defendant pleads not guilty.
> "To establish this charge, each of the following claims must be proved:
> "1.   The defendant took or confined Audrey Marie Gustin by force or threat.
> "2.   The defendant did so with the intent to hold Audrey Marie Gustin: to facilitate flight or the commission of any crime or to inflict bodily injury on or to terrorize Audrey Marie Gustin.
> "3.   Bodily harm was inflicted upon Audrey Marie Gustin.
> "4.   This act occurred on or about the 31st day of May, 2019, in Shawnee County, Kansas.
> "The State must prove that the defendant committed the offense of aggravated kidnapping intentionally. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about, or cause the result complained about, by the State."

The seminal case involving this facilitation portion of the kidnapping statute is *Buggs*. There, the female victim and her son worked at a Dairy Queen in Wichita and closed the store at 11 p.m. for the evening. Before leaving, the mother placed the day's receipts and over $300 inside a bank bag and placed the bag inside her purse. The two then went outside after locking the back door. As they did, Buggs and Ronald Perry, the other defendant in the case, approached them. Perry told them he had a weapon and directed the mother to unlock the back door and get back inside. She complied, and the

son, Buggs, and Perry followed her inside the store. After all were inside, the defendants took the money from the bank bag, and Buggs raped the mother. At the end of trial, a jury convicted Buggs of the aggravated kidnapping and rape of the mother. Both defendants were convicted of the kidnapping of the son, and both were also convicted of aggravated robbery.

On appeal, the defendants challenged their kidnapping convictions, arguing "that the movement and confinement of both victims were only 'minor and inconsequential,' and were 'merely incidental' to the real crimes of robbery and rape." 219 Kan. at 209. To resolve the question, our Supreme Court had to interpret K.S.A. 21-3420(b), the former kidnapping statute, which contained language identical to the current kidnapping statute, K.S.A. 2020 Supp. 21-5408(a)(2). See 219 Kan. at 213. In doing so, our Supreme Court focused on the word "facilitate," reasoning:

> "The key word, as we see it, is 'facilitate.' Webster defines it as 'to make easier or less difficult: free from difficulty or impediment.' (Webster's Third New International Dictionary.) See also, the Oxford English Dictionary: 'To render easier the performance of (an action), the attainment of (a result).' To be kidnapping, therefore, the taking need not be necessary to the accomplishment of the underlying crime, but it must be aimed at making it at least 'easier.'
>
> "Further, to 'facilitate' in our minds means something more than just to make more convenient. We think that a taking or confining, in order to be said to 'facilitate' a crime, must have some significant bearing on making the commission of the crime 'easier' as, for example, by lessening the risk of detection."
> . . . .
> "We therefore hold that if a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:
>
> "(a) Must not be slight, inconsequential and merely incidental to the other crime;

20

"(b) Must not be of the kind inherent in the nature of the other crime; and

"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

"For example: A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is. The forced direction of a store clerk to cross the store to open a cash register is not a kidnapping; locking him in a cooler to facilitate escape is. The list is not meant to be exhaustive, and may be subject to some qualification when actual cases arise; it nevertheless is illustrative of our holding." 219 Kan. at 214-16.

Christopher argues the evidence at trial did not meet these requirements because "the confinement had no significance independent of the attempted murder. It was merely incidental to that crime. It did not make the murder attempt or an escape substantially easier; nor did it substantially lessen the risk of detection." He then characterizes his attack on Audrey as an "ongoing attempt to murder her" and a "singular, drawn out 'attack' charged as attempted murder." We are not persuaded by this contention.

As we have noted, Audrey entered Christopher's apartment voluntarily and stood in the doorway for about five minutes before telling the children they needed to leave. When she tried to grab E.G., Christopher told her he would not allow her to leave. When she did try to leave, Christopher began beating her.

Eventually, he stopped hitting her and went to grab the knife. Audrey, recognizing this as a window to escape, got to her feet and staggered towards the door to flee the apartment with her children. But she could not get the door open in the few seconds she had. Christopher then pulled her back into the apartment and repeatedly stabbed her in the neck. Once she was on the ground, Audrey also said that Christopher straddled her for

21

nearly 30 minutes after stabbing her. And Christopher admitted to police he tackled Audrey to the ground when she made a break for the door. Similarly, he took and threw her phone so she could not call for help.

We believe Christopher's strongest argument relates to the "[m]ust not be slight, inconsequential and merely incidental to the other crime" portion of the *Buggs* test. See 219 Kan. at 216. Particularly regarding the "merely incidental to the other crime" portion. As Audrey testified, Christopher intended to watch her bleed out while she was on the floor. She pleaded with him to allow her to get off the floor, but he kept telling her he would not call for help, and he was waiting for her to bleed out. Were his intentions to simply stab her and watch her bleed out, it could be argued the act of straddling her for a long time following the stabbings were incidental to the attempted murder.

But Christopher attempted to kill Audrey by beating her, choking her, and stabbing her. And when she ran for the door, he tackled her and threw her phone so she could not call for help. After he did those things, he straddled her for nearly 30 minutes, according to Audrey. Also according to Audrey, he did not spend the entire time actively trying to harm her further. As stated above, kidnapping "requires no particular distance of removal, nor any particular time or place of confinement. Under that statute it is the fact, not the distance, of a taking (or the fact, not the time or place, of confinement) that supplies a necessary element of kidnapping." *Burden*, 275 Kan. at 943.

Moving to the second portion of the *Buggs* test, the State points out that the force inherent in the attempted murder were the blows to Audrey's head, as well as the stab wounds Christopher inflicted on her. Christopher's actions of tackling Audrey after she attempted open the door are not inherent in the attempted murder. Furthermore, Christopher's other actions in pinning Audrey to the floor for a long time is not inherent in the crime of attempted murder.

Christopher's claims are also unpersuasive under the third portion of the *Buggs* test. Tackling and straddling her after she had been beaten and stabbed served a purpose independent of the attempted murder in that they reduced the risk of detection. As is evident from the facts, Christopher did all he could to prevent Audrey alerting someone and getting help from others. According to Audrey, Christopher only held her when she lay quietly on the floor. But when she tried to call for help, he would put his hands over her nose and mouth.

In *State v. Kane*, 57 Kan. App. 2d 522, 531, 455 P.3d 811 (2019), our court stated that "Kansas law provides numerous examples of how an uncompleted or failed taking may satisfy the third factor in *Buggs* if it had the potential to make a crime substantially easier to commit." Had Christopher succeeded in maintaining control over Audrey and not allowing her to use her phone, it would have substantially lessened the risk of detection. He only relinquished control over her after he noticed she called 911.

"In [*Haberlein*, 296 Kan. at 207-209] the court determined the statutory language 'to facilitate flight or the commission of any crime' did not create alternative means but merely provides 'options within a means.'" *State v. Harris*, 310 Kan. 1026, 1034, 453 P.3d 1172 (2019). Put another way, the State only had to prove sufficient evidence Christopher either held Audrey with the intent to "facilitate flight *or* the commission of any crime." (Emphasis added.) K.S.A. 2018 Supp. 21-5408(a)(2). Viewing Christopher's actions in the light most favorable to the State, a rational factfinder could conclude Christopher held Audrey with the intent to "facilitate flight or the commission of any crime." K.S.A. 2018 Supp. 21-5408(a)(2); see *Chandler*, 307 Kan. at 668.

Affirmed.