NOT DESIGNATED FOR PUBLICATION

No. 122,156

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL WAYNE COUCH,
*Appellant*.


MEMORANDUM OPINION

Appeal from Finney District Court; MICHAEL L. QUINT, judge. Opinion filed August 19, 2022. Affirmed in part and vacated in part.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Tamara S. Hicks*, assistant county attorney, *Susan Hillier Richmeier*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before GARDNER, P.J., HILL and ISHERWOOD, JJ.


PER CURIAM: A jury convicted Michael Wayne Couch of three counts of aggravated criminal sodomy, one count of rape, one count of aggravated kidnapping, one count of aggravated burglary, and one count of aggravated battery. The district court sentenced Couch to 1,306 months in prison and ordered him to pay $3,962.81 in restitution, as well as $31,612.50 in attorney fees to the Board of Indigents' Defense Service (BIDS) and other court costs and fees. Couch appeals his convictions and sentence, arguing: (1) The district court abused its discretion by not allowing him to represent himself at trial; (2) the evidence of aggravated kidnapping was insufficient to

1

convict; (3) the district court should have instructed the jury on a lesser included offense of aggravated battery; (4) cumulative error deprived him of a fair trial; (5) Kansas' criminal restitution statutes violate section 5 of the Kansas Constitution; (6) the restitution statutes violate *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); and (7) the district court erred when it ordered him to pay BIDS attorney fees.

With the exception of his claim pertaining to BIDS fees, the issues presented do not entitle Crouch to the relief he seeks. Thus, we affirm his convictions, sentence, and restitution obligation, but we vacate the district court's imposition of the BIDS attorney fees.

FACTUAL AND PROCEDURAL BACKGROUND

On the morning of December 18, 2018, H.D. ran several errands around Garden City. She briefly stopped at Walmart around 10:30 a.m. and then drove home. Michael Wayne Couch noticed H.D. leaving the store and followed her home.

Soon after H.D. walked into her house, she heard the garage entry door open, so she walked over to close it. When she reached the door, however, Couch, who was a stranger to her, barged into the home, pinned H.D. against the kitchen sink, and held a knife to her throat. H.D. fell to the ground screaming for help, but Couch threatened to harm her if she continued yelling. About that time, H.D. and Couch both noticed cuts to H.D.'s hands, which prompted Couch to spew a series of expletives. He allowed H.D. to clean and bandage her wounds and, after she did so, Couch grabbed her arm and dragged her from the kitchen, down the hallway, and into the master bedroom.

Couch shoved H.D. onto the master bed, unbuckled her belt, then pulled her pants and underwear off. He demanded that H.D. perform oral sex on him but became

2

frustrated when he could not maintain an erection, so he forced his fingers into her vagina instead and threatened her with a knife if she was noncompliant with his demands. Couch then penetrated H.D.'s vagina with his penis. At this point in the attack, H.D. noticed three swastika tattoos on Couch's torso and had a clear view of his face and clothing. Unable to maintain an erection Couch grew increasingly frustrated, so he retrieved H.D.'s toothbrush from her bathroom and forcefully anally sodomized H.D. with it. H.D. pleaded for Couch to stop so he inexplicably directed her into the bathroom and put lotion on her hand. He then forced her back into the bedroom, threatened to inflict harm on her if she failed to "finish the job," and again demanded that she perform oral sex on him.

Couch told H.D. that his name was Michael, then wrapped her in the bed comforter and told her that her husband paid him to rape her. Couch yanked H.D.'s iPhone and Apple Watch chargers from the wall outlet, used them to bind her hands and feet, then left the bedroom. H.D. waited until she heard Couch leave the home then freed herself free from the restraints using the pocketknife Couch left behind. She called her husband to tell him what happened followed by a call to 911. H.D. then armed herself with her husband's handgun and hid in the closet until police arrived.

H.D. underwent a sexual assault examination at the hospital, which yielded evidence consistent with the rape and sodomy she reported. The police used H.D.'s report and video footage from the Walmart parking lot to search for her assailant. Three days later, an officer at the Goodland Police Department responded to a call at the town's Motel 6, where they met Couch. The officers ran the license plate on a truck Couch was driving and learned it was stolen so they impounded the vehicle. Authorities' subsequent search of the truck yielded clothes matching those from H.D.'s report and a bottle of the Bath and Body Works lotion he used during the assault. DNA testing performed as part of the investigation revealed that Couch was likely the source of blood recovered from the pocketknife and parts of H.D.'s home.

Couch was arrested and charged with three counts of aggravated criminal sodomy and one count each of rape, aggravated burglary, kidnapping, and aggravated battery.

Prior to trial, Couch filed a motion to exercise his right to self-representation. During the court's hearing on that motion Couch explained that he was "tired of lawyers," and that his appointed attorneys accused him of committing the crimes, then listed the deficiencies he believed plagued the State's case against him. When Couch's attorney addressed the court, Couch threatened to "bite [her] fucking face off." The district court asked Couch about his education level and Couch replied that he graduated high school. When the court inquired whether Couch had any legal training, Couch simply joked, "Illegal, that's it." The court then remarked:

> "Mr. Couch, I'm going to make the finding that you are not competent even in your own case to represent yourself for purposes of trial. The concern I have is that you have on numerous occasions in my presence spoke out at a time when other people were talking or trying to present their position to the court. You have effectively threatened your own attorney here in today's hearing and, frankly, I'm not sure that the victim's—crime victim portion of the Kansas constitution would allow you personally to interview or question the alleged victim in this matter, that that would be a violation of her rights. That's not something that's been adjudicated in the State of Kansas, but certainly I think at this point it's likely that you would not be able to complete that testimony or cross-examination of—of the purported victim. Court is not going to grant your request for pro se representation."

The district court also warned Couch that further outbursts during trial would result in his removal from the courtroom. On the journal entry following the motions hearing, the court noted it denied Couch's motion based on his "lack of restraint and understanding of the full scope of defenses that are available to him at his upcoming trial." The court vested Couch's counsel with exclusive authority to examine the State's witnesses and present evidence on his behalf. Later, during another pretrial hearing, Couch requested to remain in his jail jumpsuit and restraints during trial because he

4

feared he would strangle someone if left unrestrained. When the prosecutor questioned Couch about his request, Couch repeatedly told him to "fuck off" and explained, "I will just go off and start strangling and cutting people up and raping and . . . if I can steal anything in here, I'll steal it. Fuck off." Couch again requested to defend himself, but the court cited its earlier decision to prohibit that course of action.

On the first day of trial, before the jury entered the courtroom, Couch asked to submit a motion to the court and then immediately remarked, "I still agree—I speak for everyone in this courtroom—that the prosecution is a bitch. That is my motion." The court warned Couch that similar comments would prompt his removal from the courtroom. Couch again requested to defend himself and the court again denied his request. Shortly after the trial began, Couch became frustrated and attempted to leave the courtroom. The judge ordered his removal and placement in a separate room where he could observe his trial via closed-circuit television. Couch remained physically absent from the courtroom until the fourth day of trial when he testified in his own defense.

During the instructions conference the State requested several amendments to the model instructions for each count. The defense did not object to any of the proposals. During the oral pronouncement of the instructions for the jury, the court explained that with respect to count six, the aggravated battery charge, the State carried the burden to prove that Couch knowingly caused great bodily harm to H.D. and that "knowingly" meant he was aware of the circumstances in which he was acting. It did not instruct on any lesser included offenses. The jury returned a verdict of guilty on all counts.

The district court sentenced Couch to a controlling 1,306-month prison term followed by lifetime postrelease supervision and ordered him to pay $3,968.84 in restitution to the Kansas Crime Victims Compensation Board and $31,612.50 to BIDS for the representation he received. Regarding the BIDS attorney fees, the judge specifically stated:

5

"I don't anticipate that Mr. Couch will ever be able to afford to pay even the small—smallest proportion of the obligations that he has incurred here. But to be honest with you, I think it is only fair in part to require that he reimburse the expenses of the trial and the expenses as it relates to other charges. . . .

"There were attorney fees, and I understand that it is unlikely that BIDS or anyone else will ever receive any of those fees."

Couch timely brought the matter before us to resolve various issues relating to his convictions and sentence.

ANALYSIS

THE DISTRICT COURT DID NOT ERR WHEN IT PROHIBITED COUCH FROM REPRESENTING HIMSELF.

Couch argues the district court violated his rights under the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights when it refused to allow him to represent himself at trial. The State responds that denial was appropriate because he was disruptive and spewed threats during pretrial proceedings. Because an issue related to self-representation poses a legal question, this court exercises unlimited review. See *State v. Bunyard*, 307 Kan. 463, 470, 410 P.3d 902 (2018). The Sixth Amendment does not simply provide that a defense must be made for the accused; it also grants the accused the right to personally present his or her defense. *Faretta v. California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

Couch claims the district court improperly focused on his lack of legal training as its primary basis for denying his request for self-representation. Appellate courts must exercise particular scrutiny when a trial court relies on a defendant's lack of technical legal skill as its basis for prohibiting that individual from defending themselves. See *Bunyard*, 307 Kan. at 470-71; *State v. Burden*, 311 Kan. 859, 865, 467 P.3d 495 (2020).

6

But as the State points out, the right to self-representation is not absolute. 311 Kan. at 865. In *Faretta*, for example, Justice Stewart wrote that trial judges may terminate self-representation by a defendant who "deliberately engages in serious and obstructionist misconduct." 422 U.S. at 834 n.46. In *State v. Plunkett*, 261 Kan. 1024, 1028, 934 P.2d 113 (1997), the defendant requested to represent himself but exhibited a "surly, disrespectful attitude" at pretrial proceedings and "became belligerent and used profanity," so the district court reappointed counsel for him. The Kansas Supreme Court affirmed the district court's decision and found that trial judges "confronted with disruptive, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." 261 Kan. at 1029 (citing *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353 [1970]). Additionally, the Kansas Criminal Law Handbook recognizes the court's ability to terminate self-representation if the accused engages in misconduct "in any proceeding," including pretrial hearings. Kansas Criminal Law Handbook, pp. 11-8, 11-9 (5th ed. 2016); see *Plunkett*, 261 Kan. at 1028. The State contends that Couch's profanity-laced outbursts and threats of physical violence to others sufficiently substantiated the district court's denial of Couch's requests for self-representation.

Indeed, the record before us bears out that Couch repeatedly interrupted the district court, the prosecutor, and his own attorney during pretrial proceedings. Those interruptions frequently included profanity and threats. Under *Faretta*, *Plunkett*, and *Burden*, Couch's antics provided the district court with a sufficient basis to prohibit him from representing himself.

We next address Couch's specific assertion that the district court impermissibly relied on his lack of legal training when it barred him from proceeding pro se. Our review of the record reveals that while the district court inquired whether Couch possessed any legal knowledge or training, it is evident from the court's remarks that the true foundation for its denial was Couch's inability to restrain himself. The district court also expressed

concern regarding any cross-examination Couch attempted to conduct of H.D. This rationale, as opposed to Couch's lack of legal training, is memorialized in the court's journal entry. The record fails to lend any support to Couch's claim on this matter. Thus, we conclude the district court did not improperly stymie Couch from exercising his right to self-representation.

## THE STATE PRESENTED SUFFICIENT EVIDENCE TO SUSTAIN COUCH'S CONVICTION FOR AGGRAVATED KIDNAPPING.

In his second claim of error Couch argues that the State failed to present sufficient evidence to convict him of aggravated kidnapping under K.S.A. 2018 Supp. 21-5408(b), which defines "kidnapping," in relevant part, as the "(a) . . . taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such a person . . . (2) to facilitate flight or the commission of any crime." Couch contends that his movement of H.D. from the kitchen to the bedroom was "merely incidental" to the commission of the rape. The State counters that when Couch bound H.D.'s hands and feet, he did so with the intent to ease his escape, thus, sufficient evidence supports the jury's guilty verdict for aggravated kidnapping.

When a defendant challenges the sufficiency of evidence for a criminal conviction, this court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Rosa*, 304 Kan. 773, 821, 375 P.3d 332 (2016).

To bolster his claim, Couch directs our attention to *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976). In that case, Buggs robbed two Dairy Queen employees in the restaurant's parking lot as they were leaving after it closed. He ordered the employees to unlock the store and go back inside. He then raped one of them. On appeal, Buggs argued

8

his kidnapping conviction had to be reversed because his movement and confinement of the victims was minor, inconsequential, and merely incidental to the robbery and rape.

The Kansas Supreme Court looked to common-law interpretations of the term "'kidnapping,'" which historically meant "'to take and carry away any person by unlawful force or by fraud, and against his will.'" 219 Kan. at 209 (quoting *State v. Brown*, 181 Kan. 375, 388, 312 P.2d 832 [1957]). After a review of other states' kidnapping statutes and the history of the Kansas law, the court held that the mere *act* of taking—not the distance—supplies the necessary element of a kidnapping conviction. 219 Kan. at 210-14. But, as the court noted, this lone conclusion did not end the inquiry. The court keyed in on the term "facilitate" and held that it "means something more than just to make more convenient." 219 Kan. at 214-15. Rather, the term means to "have some significant bearing on making the commission of the crime 'easier'" such as lessening the risk of detection." 219 Kan. at 215.

With that in mind, the court set out three factors that must be present to support a kidnapping conviction: (a) the taking or confinement must not be slight, inconsequential, and merely incidental to the other crime; (b) it must not be of the kind inherent to the nature of the other crime; and (c) it must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection. 219 Kan. at 216. For example, the court wrote, "the removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is." 219 Kan. at 216. And since Buggs forced the victims from the public parking lot back into the Dairy Queen—presumably to lessen the risk of being seen—the court affirmed his kidnapping conviction. 219 Kan. at 216-17.

The court confronted the issue again in *State v. Richmond*, 250 Kan. 375, 827 P.2d 743 (1992). In that case, Richmond broke into the victim's residence and, when she

9

arrived home, he knocked her down, dragged her to her bedroom, and raped her. Richmond bound his victim's hands and feet and left the bedroom. He returned a short time later, however, and released her feet, but only so that he could rape her a second time. On appeal, Richmond argued that his actions inside were incidental to the rape and insufficient to rise to the level of kidnapping. The reviewing court disagreed and found that Richmond incapacitated the victim which enabled him to search the house and rob her of any valuables, unobstructed. 250 Kan. at 378. Moreover, the removal of the victim from near the entrance of the home to a distant bedroom lessened the chance of detection by anyone that arrived. Finally, he left the victim's hands bound throughout the second rape, which the court concluded facilitated the commission of the crimes and properly constituted a kidnapping. 250 Kan. at 378.

Compare this with *State v. Olsman*, 58 Kan. App. 2d 638, 473 P.3d 937 (2020). In that case, Olsman grabbed the victim's forearm when she tried to leave his home, wrapped her in a bearhug, and carried her from his living room, down the hallway, and into his bedroom where he raped her. On appeal, Olsman argued his conviction was improper under *Buggs*. The State asserted that his movement of the victim from the living room to the bedroom—an area further from the front door—lessened the risk of detection and therefore constituted a kidnapping. A panel of this court found the State's argument unpersuasive because Olsman simply moved his victim from one room of his mobile home to another, rather than from a public place to a place of seclusion. 58 Kan. App. 2d at 646. The court likewise rejected the State's theory that the conviction should stand because Olsman confined the victim to his bedroom during the rape. In support of its conclusion the panel noted that rape "necessarily and inherently requires confinement of the victim to a particular place where the rape occurs." After all, "if the victim were allowed to leave, there would be no rape." 58 Kan. App. 2d at 649. The panel reversed the defendant's kidnapping conviction. 58 Kan. App. 2d at 650.

Following a careful analysis of the evidence adduced we find that this case better aligns with *Buggs* and *Richmond*. After Couch burst into H.D.'s home, he dragged her to her bedroom at the back of her home and then raped and sodomized her. Following commission of those offenses, Couch bound her hands and feet and ordered her not to free herself until after he left. Couch's criminal conduct fulfills each component of the *Buggs* test: (1) the physical restraint of H.D.'s movement was not slight and inconsequential; (2) such restraint was not an inherent part of the rape since it occurred afterward; and (3) his directive to H.D. not to free herself until after he left is indicative of an act undertaken for purposes of avoiding detection. Viewing the evidence in a light most favorable to the State, we are convinced it is sufficient to sustain Couch's conviction for aggravated kidnapping.

## CLEAR ERROR DID NOT OCCUR WITH THE ABSENCE OF LESSER INCLUDED OFFENSE INSTRUCTIONS GIVEN THAT THE FACTS OF COUCH'S CASE DID NOT SUPPORT ALTERNATIVE THEORIES OF AGGRAVATED BATTERY.

Although Couch neither requested such instruction nor objected to the absence of the same from his trial, he now argues the district court erred when it neglected to instruct the jury on a lesser included offense of aggravated battery. The State alleged that Couch committed knowing aggravated battery in violation of K.S.A. 2018 Supp. 21-5413(b)(1)(A) when he cut H.D.'s hands with the knife. But Couch claims the district court should have instructed the jury on all subsections of K.S.A. 2018 Supp. 21-5413(b):

"(1)(B) knowingly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted;

"(1)(C) knowingly causing physical contact with another person when done in a rude, insulting, or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted;

11

"(2)(A) recklessly causing great bodily harm to another person or disfigurement of another person; and

"(2)(B) recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted."

The State contends that lesser included offense instructions were unnecessary because no evidence supported them.

When an appellant presents an instructional challenge, this court engages in a four-step analysis in which it must: (1) assess whether the issue was properly preserved, exercising an unlimited standard of review; (2) determine whether the instruction was legally appropriate; (3) determine whether the instruction was factually appropriate, reviewing the evidence supporting such an instruction in the light most favorable to the appellant; and finally (4) if the district court erred, whether such error was harmless under *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011). *State v. Haygood*, 308 Kan. 1387, 1403, 430 P.3d 11 (2018). The first and third step are interrelated: the standard of review for reversibility at the third step depends on whether a party has preserved the jury instruction challenge in the first step. *State v. McLinn* 307 Kan. 307, 317, 409 P.3d 1 (2018); see K.S.A. 2021 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous.").

*a. Preservation and standard of review*

Again, Couch's counsel neither requested the instructions at issue nor objected to their absence. As a result, the issue was not preserved, and we analyze the court's failure to give the instructions for clear error. See *State v. Trautloff*, 289 Kan. 793, 802, 217 P.3d 15 (2009). Under K.S.A. 22-3414(3), an instruction is clearly erroneous if the reviewing

12

court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *Trautloff*, 289 Kan. at 802.

### b. Were the instructions legally appropriate?

The next step in the analysis demands a determination of whether the omitted instructions were legally appropriate. Jury instructions must always fairly and accurately state the applicable law, and the failure to do so renders them legally infirm. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012).

The jury convicted Couch of aggravated battery under K.S.A. 2018 Supp. 21-5413(b)(1)(A), "knowingly causing great bodily harm to another person or disfigurement of another person," a severity level 4 person felony. He argues the district court should have instructed the jury on the other forms of that offense which carry lesser penalties. Under K.S.A. 2021 Supp. 22-3414(3), a judge must instruct the jury as to the crime charged and *any* lesser included crime. A lesser included crime is a lesser degree of the same crime or a crime where all elements of the lesser crime are identical to some elements of the crime charged. K.S.A. 2021 Supp. 21-5109(b). Each of the instructions Couch now requests fulfills the legally appropriate component as each constitutes a lesser included offense of the theory of aggravated battery with which he was charged.

### c. The instructions were not factually appropriate.

Our next step is to determine whether the evidence adduced at trial provided a sufficient factual foundation for the additional instructions. See K.S.A. 2021 Supp. 22-3414(3).

*1. Knowing aggravated battery with a deadly weapon*

Since instructions under K.S.A. 2018 Supp. 21-5413(b)(1)(B) and (b)(1)(C) were legally appropriate, we must ascertain whether they were also supported by evidence. The initial distinction which requires our attention is the degree of harm inflicted. The theory under which Couch was charged and convicted contemplated that H.D. suffered great bodily harm. The State pursued that course of action because Couch used a knife to carry out his attack against H.D. and, as a result, she suffered substantial lacerations to her hands which necessitated stitches.

The first two lesser included offense instructions for which Couch advocates share the same "knowingly" mental state as the theory the State pursued at trial. K.S.A. 2018 Supp. 21-5413(b)(1)(B) addresses acts committed with a deadly weapon that result in bodily harm or are carried out in such a way that great bodily harm, disfigurement, or death can be inflicted. K.S.A. 2018 Supp. 21-5413(b)(1)(C) encompasses those acts perpetrated with a deadly weapon which result in physical contact to another, inflicted in a rude, insulting, or angry manner, or in any manner whereby great bodily harm, disfigurement, or death can result.

To be factually warranted, there must be sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support the instruction. *State v. Perez-Medina*, 310 Kan. 525, 533, 448 P.3d 446 (2019). Stated another way, an instruction is factually appropriate if it "is supported by the particular facts of the case." *State v. Kleypas*, 305 Kan. 224, Syl. ¶ 23, 382 P.3d 373 (2016).

For purposes of this inquiry the question is whether there was evidence adduced at trial that was sufficient to pave the way for the jury to consider H.D.'s injuries through the lens now requested by Couch. The evidence introduced in support of the State's theory of the case established that Couch forced his way into H.D.'s home armed with a

14

knife. A struggle ensued and as H.D. resisted her attacker she sustained several deep slices to her hands that resulted in considerable blood loss and required sutures.

Kansas courts have defined great bodily harm as being more than slight, trivial, minor, or moderate harm and have held it does not include mere bruising. *State v. Green*, 280 Kan. 758, 765, 127 P.3d 241 (2006). In support of his request that the two aforementioned instructions were warranted, Couch contends that while H.D.'s injuries exceeded mere bruising, they were nevertheless "minimal" and only demanded a few stitches. But Couch's assertions are merely that. Further, he conclusively argues that "given the cutting abilities of a knife, there is certainly sufficient evidence that a jury could find the attack was carried out in a manner whereby great bodily harm or disfigurement could occur." However, he offers no authority, or analogous cases that lend support to this proposition. Generally, a point raised incidentally in a brief and not argued in it is considered waived or abandoned. *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020). Accordingly, we find that Couch waived the argument.

Although it is often within the jury's province to determine whether injuries constitute mere bodily harm or great bodily harm, the district court did not err in failing to include the instructions. There simply was no evidence suggesting that the harm H.D. endured was slight or trivial to support instructions for the lesser included offense that Couch now claims should have been given.

*2. Reckless aggravated battery*

Our next task is to determine whether there is factual support for the reckless aggravated battery instructions that Couch now contends the district court had an obligation to issue. In *State v. Green*, 55 Kan. App. 2d 595, 419 P.3d 83 (2018), the court examined whether a "reckless" instruction was factually appropriate following Green's conviction for knowing aggravated battery. The panel reiterated that "knowingly" means

that an offender "is aware of the nature of such person's conduct or that the circumstances exist when such person is aware that such person's conduct is reasonably certain to cause the result." 55 Kan. App. 2d at 612; see K.S.A. 2018 Supp. 21-5202(b)(2) and (i). By contrast, "recklessly," means that the person "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2018 Supp. 21-5202(b)(3) and (j). In that case, Green argued that evidence of his intoxication supported a "reckless" instruction. The court rejected that contention and affirmed his conviction upon finding that scant evidence supported a conclusion that Green's intoxication caused him to act recklessly or prevented a knowing intent when he committed the crime. 55 Kan. App. 2d at 615-16. To the contrary, all signs pointed toward Green's awareness of his conduct and its results.

The evidence in Couch's case likewise reflects an unquestionable awareness of the conduct undertaken and its attendant results. H.D. testified that Couch forced his way into her home, knocked her into her kitchen cabinet, and held his knife against her throat. She struggled against the violent attack and in the course thereof sustained multiple deep lacerations to her hands from Couch's knife.

Couch seeks to convince us that the jury could reasonably have interpreted his conduct as merely reckless given the string of expletives he uttered upon seeing the cuts to H.D.'s hands and large amount of blood.

Again, knowing aggravated battery requires proof that Couch acted while knowing that some type of great bodily harm or disfigurement of H.D. was "reasonably certain" to result from the act. See K.S.A. 2021 Supp. 21-5202(i); *State v. Hobbs*, 301 Kan. 203, 211-12, 340 P.3d 1179 (2015). In contrast, reckless aggravated battery requires proof that Couch "consciously disregard[ed] a substantial and unjustifiable risk" that harm to H.D. would result. See K.S.A. 2021 Supp. 21-5202 (j); *State v. Trefethen*, No. 119,981, 2021

16

WL 1433246, at *5-6 (Kan. App.) (unpublished opinion), *rev. denied* 314 Kan. 859 (2021).

The facts before us do not enable us to conclude that Couch's jury would have rendered a different verdict if the district court issued the instruction Couch now insists was warranted. When one bursts into the home of a stranger for the express purpose of perpetrating acts of extreme sexual violence and holds a knife to the throat of their targeted victim, the attacker knows that great bodily harm is reasonably certain to result. Couch did not merely consciously disregard a substantial risk. Rather, the knife was an integral component in forcing H.D.'s compliance with his degrading acts. Thus, he must have known that the infliction of great bodily harm was reasonably certain.

> *a. If we were to assign error to this issue, which we do not, any such occurrence is properly classified as harmless.*

Typically, the final step of the analysis in instructional challenges requires the reviewing court to determine whether any error attributable to the absence of the instruction is harmless. Since we have found that instructional error did not occur, this holding renders it unnecessary to analyze whether any error to manifest amounted to clear error given Couch's lack of specific requests or objections. See *Haygood*, 308 Kan. at 1403; see also *State v. Tahah*, 302 Kan. 783, 793, 358 P.3d 819 (2015) (the clear error standard is heightened standard of harmlessness). Clear error occurs if the "'reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred.'" *State v. Race*, 293 Kan. 69, 85, 259 P.3d 707 (2011). We are not so convinced. Couch's claim of error is denied.

17

COUCH FAILED TO SUBSTANTIATE ANY OF HIS CLAIMS OF ERROR, THUS HE IS NOT ENTITLED TO RELIEF UNDER THE THEORY OF CUMULATIVE ERROR

Couch next argues that the cumulative effect of trial errors deprived him of a fair trial. The test for cumulative error is whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. But if the evidence is overwhelming against the defendant, no prejudicial error may be found. *State v. Johnson*, 304 Kan. 924, 956, 376 P.3d 70 (2016). When considering the cumulative effect of errors, this court has unlimited review. 304 Kan. at 955. Given the absence of error from Couch's trial, he is not entitled to relief under a theory of cumulative error.

COUCH'S CONSTITUTIONAL CHALLENGES TO KANSAS' CRIMINAL RESTITUTION STATUTES DO NOT AFFORD HIM RELIEF.

The district court ordered Couch to pay $3,968.84 in restitution to the Kansas Crime Victims Compensation Board—a practice that is sanctioned by our state's criminal restitution statutes. Couch argues Kansas' restitution statutes violate section 5 of the Kansas Constitution Bill of Rights because they encroach upon a criminal defendant's common-law right to a civil jury trial on damages caused by the defendant's crime. He further contends those provisions violate his Sixth Amendment jury trial right because the statutes allow the court to make a finding of fact that increased the penalty for his crime beyond the prescribed statutory maximum. See *Apprendi*, 530 U.S. 466.

*a. Preservation*

Couch failed to object to the court's restitution finding at trial but contends we should still reach the merits of his claim. Despite the general rule against reviewing issues for the first time on appeal, Kansas courts have recognized three exceptions:  (1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the claim is necessary

18

to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

Couch claims this issue falls under both the first and second exceptions to the preservation rule. In *State v. Jones*, No. 113,044, 2016 WL 852865, at *8 (Kan. App. 2016) (unpublished opinion), the defendant similarly argued the Kansas restitution statutes violated the state's Constitution but failed to preserve his argument. The court determined that the first exception did not apply because "the determination of Jones' restitution claim is not finally determinative of the case." 2016 WL 852865, at *9. It further found the second exception inapplicable because "it cannot be argued that consideration of the issue is necessary to serve the ends of justice or to prevent a denial of fundamental rights when Jones did not even object to the imposition or the amount of restitution at sentencing." 2016 WL 852865, at *9. One year later, in *State v. Patterson*, No. 114,861, 2017 WL 3207149, at *8 (Kan. App. 2017) (unpublished opinion), a panel of this court also rejected a defendant's constitutional challenge to the restitution statutes due to a lack of proper preservation. See also *State v. Bradwell*, No. 115,153, 2016 WL 7178771, at *4 (Kan. App. 2016) (unpublished opinion) (following *Jones*).

Couch implores us to depart from *Jones*, *Patterson*, and *Bradwell*, but his arguments are unpersuasive. He asserts that "simply because he may not achieve a total exoneration of his convictions and sentence does not render any decision on restitution superfluous, and refusal to reach a constitutional error on that basis is inconsistent with the pursuit of justice." But we cannot rewrite the *Godfrey* exceptions to accommodate Couch's argument. Couch also claims that the second exception should afford him an avenue because the right to trial by jury is fundamental. But as the *Jones* panel recognized, an offender cannot claim the court violated a fundamental right when he neglected to object to the imposition or amount of restitution when he or she had the

19

opportunity to do so at sentencing. We find the *Jones* panel's rationale persuasive and opt to adhere to the same.

Even if we were inclined to review Couch's claims, which we are not, it is of no solace because they both fail under the recently decided cases of *State v. Robison*, 314 Kan. 245, 496 P.3d 892 (2021), *petition for cert. filed* February 11, 2022, and *State v. Arnett*, 314 Kan. 183, 496 P.3d 928 (2021), *cert. denied* __ S. Ct. __, 2022 WL 2295394 (U.S. 2022). In these cases, the Kansas Supreme Court addressed arguments identical to Couch's claims here and found that the current Kansas criminal restitution statutes do not trigger Sixth Amendment protections as contemplated by *Apprendi* and its progeny. *Robison*, 314 Kan. at 249-50; *Arnett*, 314 Kan. at 186-88. Meanwhile, the Kansas Supreme Court did determine that the present statutory restitution scheme violates section 5 of the Kansas Constitution Bill of Rights to the extent it allows conversion of restitution orders into civil judgments—effectively bypassing the traditional function of juries to determine civil damages. *Arnett*, 314 Kan. at 189-93. However, the *Arnett* court concluded the proper remedy was to sever the offending portions of the statutory scheme, not to vacate every restitution order. 314 Kan. at 194-95. Although Kansas restitution statutes implicate section 5, the severance of the unconstitutional provisions renders Couch's restitution judgment constitutionally valid. See *Arnett*, 314 Kan. at 194-96; *State v. Owens*, 314 Kan. 210, 242-44, 496 P.3d 902 (2021).

This court is duty-bound to follow Kansas Supreme Court precedent unless there is some indication that court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). There is no reason to suggest such a departure from this precedent considering the recency of the Kansas Supreme Court's decisions on these issues. Accordingly, Couch's constitutional claims fail.

THE DISTRICT COURT ERRED WHEN IT ORDERED COUCH TO PAY BIDS ATTORNEY FEES.

Finally, Couch argues the district court erred when it ordered him to pay BIDS fees because it explicitly found Couch is not likely to be able to meet the obligation. The State concedes that error occurred, and the order must be vacated. See *State v. Robinson*, 281 Kan. 538, 545-46, 132 P.3d 934 (2006) (repayment of attorney fees must be conditioned on the ability to pay). This issue involves a question of law with unlimited review. 281 Kan. at 539.

Where the record reflects Couch is unable to pay the fees and the district court expressly concluded as much, the order is erroneous and cannot be permitted to stand. The district court's imposition of the BIDS attorney fees is vacated.

Affirmed in part and vacated in part.